2006 UT App 261

**BRENT BROWN DEALERSHIPS,**
Petitioner,

v.

**TAX COMMISSION, MOTOR VEHICLE ENFORCEMENT DIVISION,**
Respondent.

No. 20050333–CA.

Court of Appeals of Utah.

June 22, 2006.

Gary R. Howe and Michael D. Stanger, Callister Nebeker & McCullough, Salt Lake City, for Petitioner.

Mark L. Shurtleff, Attorney General, and Gale K. Francis, Assistant Attorney General, Salt Lake City, for Respondent.

Before Judges BENCH, McHUGH, and THORNE.

## OPINION

McHUGH, Judge:

¶ 1 Brent Brown Dealerships (Brent Brown) seeks judicial review of a final decision of an Administrative Law Judge (ALJ) upholding a $135,000 fine levied by the Utah State Tax Commission (Commission) against Brent Brown for allowing unlicensed salespeople to sell cars. *See* Utah Code Ann. §§ 41–3–201(2), –210(6), –702(1)(c)(vii) (2005). We affirm.

## BACKGROUND

¶ 2 The Motor Vehicle Enforcement Division (MVED) of the Commission received a tip from a former employee of Brent Brown that salespeople at Brent Brown were selling cars without first obtaining licenses. MVED began investigating four dealerships of the Brent Brown Automotive Group, including Brent Brown Toyota, Brent Brown Chevrolet/Buick, Brent Brown Dodge/Chrysler/Jeep, and the Orem Auto Plaza.

¶ 3 Sergeant Eric MacPherson headed the investigation and assembled a team of investigators that visited the dealerships on February 10, 2004. During this visit, MacPherson and his team discovered that none of the salespeople carried licenses as required by sections 41–3–201(2) and 41–3–210(6). *See id.* §§ 41–3–201(2), –210(6). The investigators then examined the personnel files of the salespeople and learned that at least fifty-one salespeople had sold 306 vehicles over a period of twenty months without motor vehicle sales licenses as required by statute. Brent Brown asserted that because it had acquired a number of dealerships, it centralized human resources and payroll into one position, which was filled by Erlene Ashburn. Brent Brown stated that Ashburn was instructed to take care of licensing as part of her human resources duties. Brent Brown further stated that once a salesperson was hired at one of the four dealerships, that dealership would make sure that the new employee had completed a license application form and would issue a check for the $30 licensing fee, and then forward the form and the check to Ashburn, who was to send them to the Commission. However, investigators failed to find any evidence of license applications in the personnel files of the unlicensed salespeople. Instead, salespeople who were interviewed stated that they were unaware that they needed a license. None of those interviewed indicated that they had completed licensing forms.

¶ 4 During the investigation, MacPherson assisted Brent Brown in obtaining licenses on an expedited basis for all of its salespeople. Two days after the investigators visited the dealerships, all salespeople at Brent Brown had licenses.

¶ 5 MacPherson determined that Brent Brown had violated section 41–3–201(2), which prohibits a person from acting as a vehicle salesperson without first obtaining a license, and section 41–3–210(6), which prohibits a dealer from assisting unlicensed salespeople in sales of motor vehicles. *See id.* Section 41–3–702 sets forth a graduated schedule of penalties for assisting an unlicensed salesperson in sales of motor vehicles: $250 for the first offense, $1000 for the second offense, and $5000 for third and subsequent offenses. *See id.* §§ 41–3–702(1)(c)(vii), –702(2)(a)(iii). MacPherson recommended assessing a penalty of $1,168,000. He calculated this figure by determining that an "offense" under the statute occurred every time an unlicensed salesperson sold a vehicle.

¶ 6 MVED later reduced the fine to $135,000, determining that an "offense" occurred when an unlicensed salesperson sold at least one vehicle during the relevant time period, from June 2002 to February 2004. Thus, MVED decided that offenses should

not be counted according to the number of cars sold, but rather by the number of unlicensed salespeople who had made sales of one or more cars. Unlicensed salespeople who had not sold any vehicles during the relevant time period were not counted in the total fine. The $135,000 fine represented thirty-four unlicensed salespeople who had sold at least one vehicle during the time period in question. Each of the four Brent Brown dealerships was assessed $250 for the first offense, $1000 for the second offense, and $5000 for every additional offense. MVED had never assessed a fine as large as that levied against Brent Brown. MVED officials testified, however, that they had never encountered such an egregious violation of the licensing laws.

¶ 7 On July 6, 2004, MVED sent notices of the violations to each of the four dealerships. Brent Brown requested a hearing before the Appeals Division of the Commission, and on August 17, 2004, the Commission held an initial hearing. The ALJ upheld the $135,000 fine. Brent Brown appealed that decision and requested a formal hearing, which was held on February 28, 2005, before a different ALJ of the Appeals Division of the Commission. The ALJ upheld the decision from the initial hearing and the imposition of the $135,000 fine. Brent Brown then appealed to the Utah Supreme Court, which transferred the case to this court.

## ISSUES AND STANDARDS OF REVIEW

¶ 8 When reviewing the Commission's decision, we "grant the [C]ommission deference concerning its written findings of fact, applying a substantial evidence standard on review." Utah Code Ann. § 59–1–610(1)(a) (2004). We "grant the [C]ommission no deference concerning its conclusions of law, applying a correction of error standard, unless there is an explicit grant of discretion contained in the statute at issue before the appellate court." Id. § 59–1–610(1)(b). Regarding the statutes at issue in this case, "the parties have not cited us to, and we have been unable to find, any explicit grant of discretion" to the Commission "to interpret or apply the language of [those] section[s]." OSI Indus., Inc. v. Utah State Tax Comm'n,

860 P.2d 381, 383 (Utah Ct.App.1993); see also Utah Code Ann. §§ 41–3–201(2), –210(6), –702. We therefore review the Commission's interpretation and application of the statutes for correctness. See OSI Indus., Inc., 860 P.2d at 383.

## ANALYSIS

¶ 9 Brent Brown contends that the Commission's decision should be reversed because (1) the ALJ incorrectly interpreted the meaning of the term "offense" in section 41–3–702; (2) the $135,000 fine violates the Excessive Fines Clause of the United States and Utah Constitutions; (3) the fine violates due process because no notice of the violations was given before the fine was assessed; and (4) MVED departed from its prior practice by failing to give notice of the violations before assessing the fine. Each of these arguments is addressed below.

### I. Interpretation of the Term "Offense"

¶ 10 Brent Brown first contends that the ALJ incorrectly interpreted the term "offense" in section 41–3–702(2)(a)(iii). See Utah Code Ann. § 41–3–702(2)(a)(iii). Section 41–3–210(6) states that "[a] dealer may not assist an unlicensed dealer or salesperson in unlawful activity through active or passive participation in sales, or by allowing use of his facilities or dealer license number, or by any other means." Id. § 41–3–210(6). Similarly, section 41–3–201(2) prohibits a person from acting as a vehicle salesperson without "having procured a license issued by the [motor vehicle enforcement] administrator." Id. § 41–3–201(2). Section 41–3–702 provides the penalties for violating these rules: "[A]ssisting an unlicensed dealer or salesperson in sales of motor vehicles" is a Level III violation, id. § 41–3–702(1)(c)(vii), which is subject to a fine of "$250 for the first offense, $1,000 for the second offense, and $5,000 for the third and subsequent offenses." Id. § 41–3–702(2)(a)(iii).

¶ 11 Brent Brown argues that the term "offense" in section 41–3–702(2)(a)(iii) could be interpreted several different ways. Brent Brown contends that this provision could mean that it was guilty of only one

continuing violation, or that an offense occurred every time a car was sold by an unlicensed salesperson, as originally believed by MacPherson. Because of these varying meanings, Brent Brown argues, the Commission had discretion to decrease the $135,000 fine and should have done so. We disagree and conclude that the ALJ correctly interpreted the statute at issue according to long-recognized principles of statutory construction.[1]

> When interpreting statutes, our primary goal is to evince the true intent and purpose of the [l]egislature. To discover that intent, we look first to the plain language of the statute. When examining the statutory language we assume the legislature used each term advisedly and in accordance with its ordinary meaning. [T]hus, the statutory words are read literally, unless such a reading is unreasonably confused or inoperable. Furthermore, we avoid interpretations that will render portions of a statute superfluous or inoperable.

*State v. Haltom,* 2005 UT App 348, ¶ 19, 121 P.3d 42 (second alteration in original) (quotations and citations omitted), *cert. granted,* 125 P.3d 102 (Utah 2005). "When statutory language is plain and unambiguous, we do not look beyond the same to divine legislative intent." *OSI Indus., Inc.,* 860 P.2d at 383–84 (quotations and citations omitted).

¶ 12 In this case, we need not look beyond the plain meaning of the terms in the statute to determine that the ALJ's construction was correct. The ALJ focused on the language that prohibits "assisting *an unlicensed dealer* or *salesperson* in *sales* of motor vehicles," Utah Code Ann. § 41–3–702(1)(c)(vii) (emphasis added), and concluded that because "dealer" and "salesperson" are singular and "sales" is plural, the dealership committed an "offense" under the penalty provision of the

statute each time an unlicensed salesperson sold one or more cars. *See id.* § 41–3–702(2)(a)(iii); *see also id.* § 41–3–210(6) (stating that "[a] dealer may not assist *an unlicensed dealer* or *salesperson* in unlawful activity through active or passive participation in *sales*" (emphasis added)). We assume that the legislature advisedly made "dealer" and "salesperson" singular and "sales" plural; therefore, the ALJ properly considered the plain and literal meaning of these terms as written. To have determined, for instance, that Brent Brown had committed one continuing "offense" subject to a mere fine of $250 would have rendered these precise terms "inoperable." *Haltom,* 2005 UT App 348 at ¶ 19, 121 P.3d 42. Such a construction would have ignored the statute's reference to sales made by a single unlicensed salesperson or dealer, and instead substituted unlicensed sales made by the dealership as a whole. Thus, the ALJ correctly interpreted section 41–3–702. *See* Utah Code Ann. § 41–3–702.

## II. *Excessive Fines Clause*

¶ 13 Brent Brown next challenges the fine assessed against the dealerships as excessive under both the United States and the Utah Constitutions.[2] The Eighth Amendment to the United States Constitution assures that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. The Utah Constitution contains an almost identical prohibition: "Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted." Utah Const. art. I, § 9. Although Brent Brown asserts that both state and federal constitutional provisions have been violated, it has failed adequately to brief or discuss the issue under state law. Consequently, we ad-

---

1. We also respectfully disagree with the concurring opinion to the extent that it suggests we have not been asked to rule on the correct interpretation of the statute. The parties devoted substantial portions of their briefs to arguments of statutory construction, and we believe the issue is squarely before us.

2. In its brief, Brent Brown states that it "does not challenge the [c]onstitutionality of [section]

41–3–702, but rather of the fine levied pursuant to that section." At oral argument, Brent Brown stated that it was making an as-applied challenge to the statute rather than a facial one, and we analyze it as such. We thus reject the Commission's contention that this court must only examine the constitutionality of the $250, $1000, and $5000 penalties provided for in the statute rather than the aggregate $135,000 fine.

dress only the federal constitutional challenge. *See State Air Quality Bd. v. Truman Mortensen Family Trust*, 2000 UT 67, ¶ 32, 8 P.3d 266 ("Although asserting that the fine is excessive under both state and federal law, [defendant] failed to adequately brief or discuss the issue under the Utah Constitution. Accordingly, we will address the constitutional excessiveness of the fine under federal law."). Brent Brown contends that the fine assessed for the unlicensed dealers employed at its four dealerships is "clearly excessive" in violation of the Eighth Amendment. We disagree.

¶ 14 In *United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998), the United States Supreme Court set forth the framework for determining whether a statutory penalty complies with the Eighth Amendment. *See id.* at 336–37, 118 S.Ct. 2028. Bajakajian was arrested for failing to disclose $357,144 in cash that he was attempting to transport out of the country. *See id.* at 324, 118 S.Ct. 2028. Federal law requires the reporting of the removal of more than $10,000 in currency and provides that a person convicted of willfully violating the disclosure requirement shall forfeit "any property ... involved in such offense." *Id.* (omission in original). The issue before the *Bajakajian* Court was whether the forfeiture of the entire $357,144 violated the Excessive Fines Clause of the Eighth Amendment. *See id.*

¶ 15 In considering that issue, the United States Supreme Court stated, "The touchstone of the constitutional inquiry under the Excessive Fines Clause is the principle of proportionality: The amount of the forfeiture must bear some relationship to the gravity of the offense that it is designed to punish." *Id.* at 334, 118 S.Ct. 2028. Recognizing that proportionality is a relative concept, the Supreme Court relied on two considerations in deriving a constitutional excessiveness standard. The first of these is that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *Id.* at 336, 118 S.Ct. 2028 (citing *Solem v. Helm*, 463 U.S. 277, 290, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983)). The second consideration is that "any judicial determina-

tion regarding the gravity of a particular criminal offense will be inherently imprecise." *Id.* The *Bajakajian* Court concluded that recognition of these principles supports a standard that a "punitive forfeiture clause" violates the Excessive Fines Clause only if it is "grossly disproportional to the gravity of a defendant's offense." *Id.* at 334, 118 S.Ct. 2028. Applying that standard, the United States Supreme Court held that the forfeiture of the entire $357,144 would violate the Excessive Fines Clause. *See id.* at 344, 118 S.Ct. 2028.

¶ 16 Although the case before us is not a forfeiture case, the *Bajakajian* analysis is helpful in evaluating the challenge to the statutory penalties imposed on Brent Brown. *See id.* at 328, 118 S.Ct. 2028 ("The Excessive Fines Clause ... limits the government's power to extract payments, *whether in cash or in kind*, as punishment for some offense." (emphasis added) (quotations and citation omitted)). The gross disproportionality test of *Bajakajian* was adopted by the Utah Supreme Court in *Truman Mortensen Family Trust* to evaluate an Eighth Amendment challenge to civil penalties imposed for violation of state asbestos regulations. *See* 2000 UT 67 at ¶ 33, 8 P.3d 266 ("The fact that [*Bajakajian*] deals with civil forfeitures rather than fines is not relevant for our purposes because forfeitures and fines differ only in that a forfeiture is a payment in kind." (citation omitted)).

¶ 17 In *Truman Mortensen Family Trust*, the Utah Supreme Court conducted its gross disproportionality analysis by comparing the fine assessed to the maximum fine that could have been levied under the applicable administrative rule, and by taking into account the nature of the defendant's conduct in dealing with asbestos in her apartment building. *See id.* at ¶ 36. In determining that the fine was not grossly disproportional, the court considered that the defendant could have faced a maximum fine of $41,000 but was only assessed $23,000. *See id.* The court also noted that the defendant's violations of the regulations were severe because she hired workers to remove asbestos from her apartment building without ensuring that they were qualified to do so. *See id.* at ¶¶ 4,

36. The evidence showed that these workers allowed asbestos dust to pile up several inches thick on the floor, and then the defendant began vacuuming the carcinogenic substance after being told by state officials not to do so. *See id.* at ¶¶ 4–5, 36.

¶ 18 Other courts have considered similar factors in conducting their Eighth Amendment analyses. For example, in *MacLean v. State Board of Retirement,* 432 Mass. 339, 733 N.E.2d 1053 (Mass.2000), the Supreme Judicial Court of Massachusetts examined the gravity of the offense, the maximum fine that could be imposed, the extent of the unlawful activity, the amount of illegal gain in relation to the penalty, and the harm caused. *See id.* at 1061–62; *see also Bajakajian,* 524 U.S. at 339–40, 118 S.Ct. 2028 (comparing the amount of the forfeiture, $357,144, to the gravity of the offense; examining also the harm that the respondent caused); *United States v. Lippert,* 148 F.3d 974, 978 (8th Cir.1998) (taking into account maximum fine that could have been imposed).

¶ 19 Applying these factors here, we conclude that the $135,000 fine assessed against Brent Brown is not grossly disproportional. In reaching this conclusion, we first note that the Commission correctly narrowed the definition of "offense" to include only the number of unlicensed salespeople who had sold at least one car, and by not counting unlicensed salespeople who had not sold any vehicles, the Commission properly imposed the penalty scheme adopted by the legislature. That scheme provides a mathematical formula that calculates the precise amount of the fine, rather than a range. Thus, there is no difference between the maximum fine allowed and what was imposed.

¶ 20 Furthermore, Brent Brown's failure to comply with the licensing statutes was egregious. MVED officials testified that this was the most extensive violation of the licensing statutes they had ever seen. And the Commission concluded that Brent Brown's significant non-compliance was not merely the failure of a single employee, Ashburn, to file the appropriate paperwork. Rather, it appears that Brent Brown did not have a basic process in place for licensing new sales-people, as evidenced by the at least fifty-one unlicensed salespeople who sold 306 vehicles over a period of twenty months. Many of the unlicensed salespeople stated they had never completed any licensing paperwork and did not know they were required to obtain a license. *See United States v. Emerson,* 107 F.3d 77, 80 (1st Cir.1997) (holding that fine was not excessive because, in part, the district court found "a pattern of persistent disregard of government regulation"); *MacLean,* 733 N.E.2d at 1062 (noting that, in contrast to *Bajakajian,* which involved a single violation, the fine at issue was not excessive because "[t]here were multiple illegal activities triggering the forfeiture, not a single minor violation, and the offenses occurred over a period of time").

¶ 21 The fine is also not grossly disproportional when compared to the monetary value Brent Brown gained by participating in the prohibited activity—i.e., the selling of cars by unlicensed salespeople. *See MacLean,* 733 N.E.2d at 1062. The Commission argued at the final agency hearing that if the average price of a car sold by an unlicensed salesperson during the relevant period was $20,000, the sale of 306 vehicles would result in sales worth $6,120,000. The $135,000 penalty divided by the 306 cars sold results in a fine of about $441 for each vehicle sold. Viewed this way, the fine is well within the limits of the Eighth Amendment. *Compare Lippert,* 148 F.3d at 978 (holding that a penalty equal to two times the amount appellant received in violation of the federal Anti–Kickback Act was not grossly disproportional), *and San Huan New Materials High Tech, Inc. v. International Trade Comm'n,* 161 F.3d 1347, 1363–65 (Fed.Cir.1998) (holding that trade commission's $1.55 million penalty was "well within constitutional limits" even though fine was three times the value of infringing imports), *and United States v. Bieri,* 68 F.3d 232, 237 (8th Cir.1995) (holding that forfeiture of farm worth $245,000 was not grossly disproportional because the farm's value was "roughly equal to the wholesale value of the marijuana that was brought to the farm or distributed from the farm during the life of the conspiracy"), *with Commonwealth v. 5444 Spruce St.,* 574 Pa. 423, 832 A.2d 396,

403 (2003) (remanding to trial court to determine value of forfeited property where value of drugs involved in defendant's guilty plea was less than $80).

¶ 22 Brent Brown argues, however, that we should not look at the fine in relation to the sales price of each car, but rather to "Brent Brown's profit on the sale. Clearly, a $5,000 fine will quickly swallow that profit." We reject this argument for several reasons. First, Brent Brown did not supply us with the amount that it profits on each vehicle sold, so it is impossible for us to conduct such an analysis. Second, it would be incorrect for us to compare Brent Brown's profit, assuming we had that figure, to a $5000 fine on each vehicle. As explained above, the fine was not calculated based on the number of vehicles sold, but rather on the number of unlicensed salespeople who may have sold several vehicles each. So, not every vehicle sold was subject to a $5000 fine. Also, not every unlicensed salesperson was counted as a third offense warranting a $5000 fine. Each of the four Brent Brown dealerships was assessed a first offense, triggering the $250 fine, and a second offense, triggering the $1000 fine. We accordingly reject this argument.

¶ 23 Brent Brown also argues that the $135,000 fine was excessive because its failure to license salespeople did not result in any harm. See United States v. Bajakajian, 524 U.S. 321, 339, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (considering minimal harm caused by respondent in gross disproportionality analysis). Brent Brown argues that the purposes of the statute are to ensure that salespeople are knowledgeable about the cars and that salespeople do not have crimi-

nal backgrounds. Brent Brown contends that neither of those concerns is at issue here.

¶ 24 We agree that the known harm in this case was minimal.[3] Nonetheless, we defer to the punishments set forth by the legislature, which made failure to license salespeople a Level III violation subject to the greatest penalties in the statute. See id. at 336, 118 S.Ct. 2028 ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature."); cf. Emerson, 107 F.3d at 80 (agreeing with the district court's reasoning that "[i]t is of no moment that many of the violations involved record-keeping or other technical functions and that none resulted in serious personal injury" because "the failure to comply [with federal aviation laws] cannot be viewed as a benign violation simply because of the clerical or technical nature of the violated regulations" (quotations omitted)). We also note that harm is but one factor in the analysis, and that the other factors weigh in favor of upholding the fine. We therefore hold that the $135,000 fine does not violate the Excessive Fines Clause.[4]

### III. Due Process

¶ 25 Brent Brown also argues that the fine in this case violated the requirements of due process because the Commission did not notify Brent Brown of the violations before applying the statute's enhancement provisions. Brent Brown asserts that "as the result of a single investigation, and without any previous notice that any violation of the statute had occurred, Brent Brown found itself facing a $135,000 fine." Brent Brown likens this

3. The Commission noted at oral argument, however, that no investigation of the 306 sales transactions has been conducted to determine whether any irregularities exist.

4. Brent Brown also relies on State v. Starlight Club, 17 Utah 2d 174, 406 P.2d 912 (1965). In that case, the Utah Supreme Court held that one fine was appropriate for selling alcohol without a license even though the investigation had taken place over three days and a police officer and his wife had been able to buy a number of drinks during that time. See id. at 914. The court reduced a $7500 fine for three separate offenses to $2500, the fine for one offense. See id. at 913–

14. The court stated that "under the circumstances of this particular case," id. at 915, a $7500 fine would be unconstitutionally excessive because the police engaged in what was really only one investigation designed to revoke the defendant's charter. See id. at 914. We do not believe that Starlight Club changes the outcome of our Eighth Amendment analysis here. As emphasized in that case, the supreme court confined its holding to the circumstances of and statute at issue in that case. Furthermore, the Starlight Club also lost its corporate charter, see id. at 915, which was a much greater economic penalty than the fine that was assessed.

case to the criminal law context in which there must be a prior conviction preceding any enhancements that would heighten the penalty. We conclude that due process did not require any notice to Brent Brown before the $135,000 fine was imposed.

¶ 26 Utah's Due Process Clause provides that "[n]o person shall be deprived of life, liberty[,] or property, without due process of law," Utah Const. art. I, § 7, and is "substantially the same as the due process guarantees contained in the Fifth and Fourteenth amendments to the United States Constitution." *In re Worthen,* 926 P.2d 853, 876 (Utah 1996). "The requirements of due process depend upon the specific context in which they are applied because unlike some legal rules due process is not a technical conception with a fixed content unrelated to time, place, and circumstances." *V–1 Oil Co. v. Department of Envtl. Quality,* 939 P.2d 1192, 1196 (Utah 1997) (quotations and citation omitted). When an administrative agency engages in adversarial, adjudicative decision-making, as in this case, attention must be paid to due process. *See id.* at 1196–97. "[T]imely and adequate notice and an opportunity to be heard in a meaningful way are at the very heart of procedural fairness." *In re Worthen,* 926 P.2d at 876 (quotations, citations, and footnote omitted). "[E]very person who brings a claim in a court or at a hearing held before an administrative agency has a due process right to receive a fair trial in front of a fair tribunal." *Id.* (quotations and citations omitted).

¶ 27 The Commission complied with these due process requirements in this case. The notice requirement was met because the Commission sent letters informing Brent Brown of exactly what statutes they had violated and of the fine that was to be assessed. *See* Utah Code Ann. § 63–46b–3(2) (2004) (setting forth requirements for commencing an agency action, including what the first notice must contain). Brent Brown also had the opportunity to be heard in two separate administrative proceedings, a formal one and an informal one. Our due process jurisprudence does not contain the requirement, as Brent Brown suggests, that notice of a violation must be given before statutory penalties may be applied.

¶ 28 Brent Brown relies on *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), which states that due process dictates that "a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *Id.* at 574, 116 S.Ct. 1589. In *Gore,* the Supreme Court held that a punitive damages award of $2 million was excessive for BMW's practice of selling damaged cars as new, when the cost of repair amounted to less than three percent of the car's suggested retail price. *See id.* at 562, 586–87, 116 S.Ct. 1589. In reaching this conclusion, the Court examined the degree of reprehensibility of BMW's conduct, the disparity between the harm or potential harm suffered by the plaintiff and the punitive damages award, and the difference between this remedy and the civil penalties authorized or imposed in comparable cases. *See id.* at 575–86, 116 S.Ct. 1589.

¶ 29 *Gore* does not compel reversal in this case. There, the Court was dealing with a jury award, whereas here we are examining the application of legislatively crafted penalties in a statute. *See United States v. Bajakajian,* 524 U.S. 321, 336, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) ("[J]udgments about the appropriate punishment for an offense belong in the first instance to the legislature."). Furthermore, in *Gore,* the Court held that BMW did not have sufficient notice of the possibility of a multimillion-dollar verdict because, in part, the civil penalties for unfair trade practices in various relevant states ranged from $50 to $10,000. *See* 517 U.S. at 584, 116 S.Ct. 1589. Here, the fines were outlined in the statute, and Brent Brown is not excused from complying with the law simply because the law was unknown to him. *See Rossberg v. Holesapple,* 123 Utah 544, 260 P.2d 563, 566 (1953) ("Ignorance of the law excuses no one ...." (quotations and citation omitted)). The imposition of the $135,000 fine did not violate due process.

## IV. *The Commission's Prior Practice*

¶ 30 Brent Brown's final argument is that the Commission departed from its prior prac-

tice by not notifying Brent Brown of the licensing violations before imposing the graduated fines in Utah Code section 41–3–702(2)(a)(iii). *See* Utah Code Ann. § 41–3–702(2)(a)(iii). Brent Brown cites the Utah Administrative Procedures Act, which states that the appellate court shall grant relief if it determines "that a person seeking judicial review has been substantially prejudiced," *id.* § 63–46b–16(4) (2004), by an agency action that is "contrary to the agency's prior practice, unless the agency justifies the inconsistency by giving facts and reasons that demonstrate a fair and rational basis for the inconsistency." *Id.* § 63–46b–16(4)(h)(iii). To support the contention that this statute should be applied here, Brent Brown cites a previous Commission case that deals with a car dealership's violation of advertising regulations. Brent Brown argues that in that case, the dealership was fined for only one offense despite the fact that the dealership aired the offending advertisement thirteen times.

¶31 As noted above, Utah Code section 59–1–610 governs appellate review of formal adjudicative proceedings in Commission cases. Section 59–1–610 states explicitly that "[t]his section super[s]edes [s]ection 63–46b–16 pertaining to judicial review of formal adjudicative proceedings." *Id.* § 59–1–610(2); *see also 49th St. Galleria v. Utah State Tax Comm'n*, 860 P.2d 996, 999 (Utah Ct.App.1993) ("[Section 59–1–610] supersedes the Utah Administrative Procedures Act insofar as it pertains to judicial review of formal adjudicative proceedings."). Therefore, we need not consider Brent Brown's argument that the Commission departed from prior practice, because under the relevant statute, departure from prior practice under section 63–46b–16 is not a basis for appellate relief in Commission cases.[5]

## CONCLUSION

¶32 The Commission correctly interpreted the term "offense" in Utah Code section 41–

3–702(2)(a)(iii). Furthermore, the $135,000 fine was not grossly disproportional in violation of the Eighth Amendment, nor did the imposition of the fine violate the notice requirements of due process. Finally, we find it unnecessary to analyze Brent Brown's argument that the Commission departed from prior practice by not giving notice of the violations before imposing the fine. We affirm.

¶33 I CONCUR: RUSSELL W. BENCH, Presiding Judge.

THORNE, Judge (concurring in the result):

¶34 I concur in both the result reached by the majority opinion and its analysis, except for its interpretation of the word "offense" as used in Utah Code section 41–3–702(2). *See* Utah Code Ann. § 41–3–702(2) (2005). I do not believe that Brent Brown's arguments in this case necessitate a formal and final interpretation of that term, or the underlying prohibition on licensed dealers assisting unlicensed salespersons in unlawful activity, *see id.* § 41–3–210(6) (2005). Accordingly, I would decline to interpret either statute at this time and instead reserve the issue until a question of statutory interpretation is presented to us directly.

¶35 My objection to the majority opinion's approach is that Brent Brown does not challenge the Commission's interpretation of the statutory terms as incorrect—indeed, Brent Brown characterizes the Commission's interpretation as reasonable. Rather, Brent Brown's argument regarding the statutory terms is that there are multiple reasonable interpretations, and that this multitude of possibilities inherently grants the Commission discretion to decrease the civil penalties established under section 41–3–702. Brent Brown's contention in this regard is easily disposed of as a matter of law without reach-

---

5. We note, however, that even if we were to consider this argument, Brent Brown would likely be unsuccessful. Citation to one Commission case involving a statutory violation different than the one at issue here is insufficient to show departure from prior practice. *Cf. Pickett v. Utah Dep't of Commerce*, 858 P.2d 187, 191–92

(Utah Ct.App.1993) (concluding that pharmacist raised a question about the consistency of his penalty with prior agency practice because he cited "ten agency decisions in which pharmacists committed allegedly equal or more significant violations of the law, but received substantially lighter penalties").

ing the question of either statute's actual meaning.

¶ 36 The existence of multiple reasonable interpretations of a statute does not create discretion in an interpreting agency. Rather, such multiple interpretations render a statute ambiguous. *See Li v. Zhang,* 2005 UT App 246,¶ 8, 120 P.3d 30 ("[The] existence of two reasonable, yet conflicting, interpretations of [a] statute renders it ambiguous."), *cert. granted,* 124 P.3d 634 (Utah 2005); *see also Derbidge v. Mutual Protective Ins. Co.,* 963 P.2d 788, 791 (Utah Ct.App. 1998) (" 'Ambiguous' means capable of 'two or more *plausible* meanings.' " (quotations and citation omitted)). Ambiguity in a statute allows us to look beyond a statute's plain language and take into account legislative history and public policy considerations, but the ultimate result is the determination of a single, correct interpretation of the statute.[1] *See Li,* 2005 UT App 246 at ¶ 8, 120 P.3d 30.

¶ 37 Thus, even if one or more statutory terms determining Brent Brown's liability are ambiguous, the licensing and civil penalty scheme adopted by the legislature has only one correct interpretation, to be determined as a matter of law. The Commission either correctly divined that interpretation or it did not, but either way there is no discretion on the part of the Commission to interpret the statute as it sees fit depending on the circumstances before it.[2] I would dispose of Brent Brown's discretion argument merely by noting that ambiguity does not create discretion, without reaching the question of what the statutes actually mean.

¶ 38 Although I would not reach the question, I do not necessarily disagree with the majority opinion's interpretation of section 41–3–702 and, by implication, section 41–3–210. I cannot join, however, in the assump-

tion that the meaning of the licensing and civil penalty scheme as a whole is so clear as to allow us to decide the issue sua sponte based on the plain language of the statutes. The majority opinion will bind both the Commission and its licensees to a statutory interpretation made by this court without the benefit of reasoned argument and authority from adverse parties. I can envision arguments for alternative interpretations that may prove persuasive if properly supported. Although I express no opinion on whether any of these arguments might prevail if properly presented, I point them out as potential issues that are foreclosed by the majority opinion's unnecessary interpretation of the licensing statutes.

¶ 39 For example, the majority opinion's interpretation would seem to bar the Commission from pursuing violations where a dealer employs an unlicensed salesperson who attempts, but fails, to complete the sale of a vehicle. The actual violation at issue is "*assist[ing] an unlicensed ... salesperson in unlawful activity* through active or passive participation in sales, or by allowing use of his facilities or dealer license number, or by any other means." Utah Code Ann. § 41–3–210(6) (emphasis added). A person acts as a salesperson if he or she is employed by a dealer "to sell, purchase, or exchange *or to negotiate for the sale, purchase, or exchange* of motor vehicles," *id.* § 41–3–102(25) (2005) (emphasis added), and those acts are unlawful unless the person is licensed as a salesperson, *see id.* § 41–3–201(2) (2005). Thus, in the appropriate circumstances, the Commission might argue that it is entitled to seek a civil penalty when an unlicensed sales-

1. The violations at issue in this matter are statutory, and "[a]bsent a grant of discretion, an agency's interpretation or application of statutory terms should be reviewed under the correction-of-error standard." *Bonneville Asphalt v. Labor Comm'n,* 2004 UT App 137,¶ 4, 91 P.3d 849 (quoting *Esquivel v. Labor Comm'n,* 2000 UT 66,¶ 14, 7 P.3d 777). There is no grant of agency discretion here, and thus, we would ordinarily review a party's challenge to the agency's interpretation of statutory terms for correctness. *See id.* (" '[M]atters of statutory construction are questions of law that are reviewed for correct-

ness.' " (quoting *Esquivel,* 2000 UT 66 at ¶ 13, 7 P.3d 777)).

2. This is not to suggest that the Commission lacks discretion in making charging decisions under the licensing scheme. Like any other plaintiff or prosecutor, the Commission may decide to charge fewer or lesser violations than the evidence might support. However, any successful charge must ultimately satisfy the single legal definition of the violation at issue.

person employed by a dealer merely attempts to sell a motor vehicle.[3]

¶ 40 From the licensee's perspective, there appears to be at least an argument that a dealer's uninterrupted employment of multiple unlicensed salespersons at a single dealership might constitute but a single violation. *See id.* § 68–3–12(1) (2004) (stating as a general rule of statutory construction that the words in the singular include the plural unless such a construction would be inconsistent with the manifest intent of the legislature or repugnant to the context of the statute). Similarly, the Commission's decision, affirmed by the majority opinion, to charge first, second, and third offenses in a single action also seems as if it could present legal arguments not raised by Brent Brown.[4] *See id.* § 41–3–702(2).

¶ 41 Of the two positions presented to us on appeal, I find the Commission's more persuasive. And, in the absence of reasoned argument to the contrary, I am willing to accept the Commission's interpretation of the licensing statutes as supporting a separate violation for each unlicensed salesperson that sold a vehicle in this case.[5] I do not, however, think it wise to decide the meaning of the statutes without the benefit of briefing directly addressing the issue. Rather, I would dismiss Brent Brown's argument that statutory ambiguity creates agency discretion as meritless on its face and decline to interpret the statutes at this time.

---

**3.** At the other end of the spectrum, the Commission might argue for a separate civil penalty for each vehicle actually sold, a result that was initially contemplated in this matter.

**4.** For example, section 41–3–702(2)(b) states that "[w]hen determining under this section if an offense is a second or subsequent offense, only prior offenses committed within the 12 months prior to the commission of the current offense may be considered." Utah Code Ann. § 41–3–702(2)(b). On its face, the Commission's decision reflects that Brent Brown's violations occurred from June 2002 through February 2004, a period exceeding eighteen months. Depending on the actual record of offenses established by

the Commission, it would seem that a party in Brent Brown's position should be able to argue the effect of the statute's twelve-month cap on considering prior offenses.

**5.** As noted above, it is within the discretion of the Commission to charge fewer violations than the evidence might support. Thus, I do not find the fact that the Commission limited itself to a particular theory of violation in this case, and the ALJ accepted that theory as an appropriate use of the statutes, to have any bearing on the proper interpretation of the statutes or the ultimate limits of the Commission's authority to charge multiple violations.