2011 UT App 181

**Bradley J. OLSEN, an individual; American Pension Services, Inc., Administrator for Roth IRA # 6765, a Utah corporation; American Pension Services, Inc., Administrator for Roth IRA # 7453, a Utah corporation, Plaintiffs and Appellants,**

v.

**Doug CHASE, an individual; Chantel S. Chase, an individual; and Bank of the West, a California corporation, Defendants and Appellees.**

No. 20090903–CA.

Court of Appeals of Utah.

June 1, 2011.

Paul P. Burghardt and Zachary E. Peterson, Salt Lake City, for Appellants.

Ronald G. Russell and Royce B. Covington, Salt Lake City, for Appellees.

Before Judges DAVIS, VOROS, and CHRISTIANSEN.

## AMENDED OPINION *

VOROS, Judge:

¶ 1 Bradley J. Olsen and the other named appellants (collectively, Lien Claimants) appeal the trial court's entry of summary judgment in favor of appellees Doug and Chantel S. Chase and Bank of the West (collectively, Owners). The trial court's ruling, in effect, extinguished Lien Claimants' mechanic's lien

---

* This Amended Opinion replaces the Opinion in    Case No. 20090903–CA issued on March 3, 2011.

based on a subordination agreement signed by the parties' predecessors-in-interest. The question before us is whether pre–2007 statutory law renders unenforceable this private agreement to subordinate the mechanic's lien to an otherwise junior construction loan. We hold that it does and accordingly reverse.

## BACKGROUND

¶ 2 Around August 2006, Matt Hood and Maestro Builders (Maestro) entered into an agreement for the construction of a new home in Layton, Utah (the Property). Maestro began construction on the Property no later than November 1, 2006. To finance the construction, Hood obtained a loan (the Construction Loan) from First Utah Bank. This loan was secured by a trust deed on the Property recorded November 9, 2006. At the closing of the Construction Loan, Maestro's agent Luke Watkins signed a "Guaranty of Completion and Performance" (the Completion Guaranty). Watkins did not review the Completion Guaranty before signing it, relying instead on a representation made by an agent of First Utah Bank. The agent stated that the Completion Guaranty "just tells the bank—or tells us that if the home owner dies that you'll finish the [home] for us, you'll guarantee the completion of the home and that you'll finish the home if the homeowner is not around." However, the Completion Guaranty also contained a subordination agreement:

> Guarantor [Maestro] agrees that the [Construction] Loan, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower.

¶ 3 Maestro completed the construction project. But before Maestro was paid in full, Hood defaulted on the Construction Loan and First Utah Bank foreclosed on the Property. Maestro recorded a notice of its mechanic's lien (the Mechanic's Lien), *see* Utah Code Ann. § 38–1–7 (2010), on the Property.[1] Because Maestro began construction on the project not later than November 1, 2006, and the Construction Loan was not recorded until November 9, 2006, the Mechanic's Lien was senior to the Construction Loan, subject to the effect of the Completion Guaranty.[2] In a foreclosure sale, First Utah Bank sold the Property to a third party, who in turn sold it to the Chases. The Chases' purchase was financed by Bank of the West, which, on July 18, 2008, recorded two trust deeds against the Property totaling $323,000. That same day, Maestro filed an Amended Notice of Lien against the Property for approximately $60,000 and assigned that interest to Lien Claimants.

¶ 4 Lien Claimants brought this action seeking to foreclose on the Mechanic's Lien. The parties filed competing motions for summary judgment, each claiming priority. The trial court granted summary judgment in favor of Owners, ruling that the subordination agreement contained in the Completion Guaranty rendered the Mechanic's Lien junior to the Construction Loan. The trial court also rejected as a matter of law Lien Claimants' contention that because Maestro had been fraudulently induced to sign the Completion Guaranty, the subordination agreement within it was invalid. The Mechanic's Lien was, consequently, extinguished by First Utah Bank's foreclosure and sale to Owners. *See City Consumer Servs., Inc. v. Peters*, 815 P.2d 234, 236–37 (Utah 1991) (noting that foreclosure of a senior lien leaves the "sold-out junior" unsecured). Lien Claimants appeal.

---

1. With the exception of Utah Code section 38–1–39, which was enacted in 2007, the relevant code sections have not been materially altered since the Completion Guaranty was executed in 2006. *See* Utah Code Ann. § 38–1–39 (2010). We therefore cite to the current version of the code as a convenience to the reader.

2. A mechanic's lien's priority relates back to "the time of the commencement to do work or furnish materials on the ground for the structure or improvement, and shall have priority over any lien, mortgage, or other encumbrance which may have attached subsequently to the time when the ... work [was] begun." Utah Code Ann. § 38–1–5 (2010).

## ISSUES

¶ 5 First, Lien Claimants contend that the trial court erred when it ruled as a matter of law that the Completion Guaranty had the effect of subordinating the Mechanic's Lien to the Construction Loan. Specifically, Lien Claimants argue that a provision of the Utah Mechanics' Liens Act, *see* Utah Code Ann. §§ 38–1–1 to –40 (2010) (the Mechanics' Liens Act), in effect at the time, rendered such a subordination agreement unenforceable.

¶ 6 Second, Lien Claimants contend that, even if the Completion Guaranty would otherwise be enforceable under the Mechanics' Liens Act, it is nevertheless unenforceable because Hood was fraudulently induced to sign it. Accordingly, they argue that the trial court erred in granting summary judgment in favor of Owners rather than letting this case proceed to trial.

## STANDARD OF REVIEW

¶ 7 Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c). We "[review] a trial court's legal conclusions and ultimate grant or denial of summary judgment for correctness and [view] the facts and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Bingham v. Roosevelt City Corp.*, 2010 UT 37, ¶ 10, 235 P.3d 730. In addition, we "review questions of statutory interpretation for correctness giving no deference to the trial court's interpretation." *In re S.C.*, 1999 UT App 251, ¶ 8, 987 P.2d 611 (internal quotation marks omitted).

## ANALYSIS

¶ 8 "When faced with a question of statutory interpretation, our primary goal is to evince the true intent and purpose of the Legislature. We do so by looking at the best evidence of legislative intent, namely, the plain language of the statute itself." *Archuleta v. St. Mark's Hosp.*, 2009 UT 36, ¶ 8, 238 P.3d 1044 (citations and internal quotation marks omitted). To determine the meaning of the plain language, we examine the statute "in harmony with other statutes in the same chapter and related chapters." *LPI Servs. v. McGee*, 2009 UT 41, ¶ 11, 215 P.3d 135 (internal quotation marks omitted).

¶ 9 In addition, the Utah Supreme Court has recognized that "[t]he purpose and intent of Utah's Mechanics' Lien Act manifestly has been to protect, at all hazards, those who perform the labor and furnish the materials which enter into the construction of a building or other improvement." *Sill v. Hart*, 2007 UT 45, ¶ 8, 162 P.3d 1099 (citation and internal quotation marks omitted). "We construe the lien statutes broadly to effectuate that purpose." *Interiors Contracting, Inc. v. Navalco*, 648 P.2d 1382, 1386 (Utah 1982).

¶ 10 A mechanic's lien takes effect when work on the property is commenced or materials are furnished and has priority over any liens, including mortgages, that attach thereafter:

> The liens herein provided for shall relate back to, and take effect as of, the time of the commencement to do work or furnish materials on the ground for the structure or improvement, and shall have priority over any lien, mortgage or other encumbrance which may have attached subsequently to the time when the building, improvement or structure was commenced, work begun, or first material furnished on the ground....

Utah Code Ann. § 38–1–5 (Supp.2010); *see also EDSA/Cloward, LLC v. Klibanoff*, 2005 UT App 367, ¶¶ 13–14, 122 P.3d 646 (noting that Utah Code section 38–1–5 establishes the priority of a mechanic's lien). Thus, the Mechanic's Lien would have survived First Utah Bank's foreclosure and would enjoy priority over Bank of the West's trust deed but for the subordination agreement.

¶ 11 The subordination agreement purports to alter the statutorily prescribed priority of the parties' respective liens:

> Guarantor [Maestro] agrees that the Loan, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby

expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower.

The central question posed on appeal is whether this provision contravenes section 38–1–29 of the Mechanics' Liens Act. Section 38–1–29 reads in its entirety:

The applicability of the provisions of this chapter, including the waiver of rights or privileges granted under this chapter, may not be varied by agreement.

Utah Code Ann. § 38–1–29.

¶ 12 The trial court ruled that the Completion Guaranty did not run afoul of section 38–1–29. The court reasoned that the Completion Guaranty does not "indicate that the provisions of Utah's mechanic's lien statute would not be 'applicable,' nor does it indicate that Maestro would be 'waiving' any rights under that statute." Instead, the court ruled, the Completion Guaranty "simply provides that whatever rights Maestro might have ... would be subordinate to the bank's rights under its construction loan." Lien Claimants contend that the trial court construed section 38–1–29 too narrowly and that the statutory language "covers more than just waivers" and, in fact, "prohibits a lien claimant from varying any of the provisions of the statute, regardless of the form of the agreement—whether a waiver, subordination, or guaranty." We agree.

¶ 13 Section 38–1–29 prevents parties from varying by agreement "[t]he applicability of the provisions of this chapter, including the waiver of rights or privileges granted under this chapter." *Id.* § 38–1–29. We do not read this provision narrowly to prohibit agreements that seek to alter the parties' rights or privileges only by employing some variation of the word "applicability" or, for that matter, any other particular word or combination of words. Rather, we "broadly construe the statute to effect its remedial purpose[ ]," *Forsberg v. Bovis Lend Lease,*

*Inc.,* 2008 UT App 146, ¶ 43, 184 P.3d 610, which is to prohibit agreements whose purpose or effect is to render any provision of the chapter inapplicable, whatever words the agreement may happen to employ to achieve that result. Nor do we read the phrase "including the waiver of rights or privileges granted under this chapter" as limiting the scope of the prohibition. The word "including" is generally used as "a word of enlargement and not of limitation." *Checkrite Recovery Servs. v. King,* 2002 UT 76, ¶ 7, 52 P.3d 1265 (quoting *Words and Phrases,* Vol. 20 A. 152). It indicates that a statutory list "is illustrative, not exhaustive." *State v. Forsyth,* 641 P.2d 1172, 1175 (Utah 1982). Thus, while the category of "waiver[s] of rights or privileges" is among the provisions of the Act that may not be varied by agreement, it does not limit the kinds of provisions to which the statute extends.

¶ 14 In sum—subject to Utah Code section 38–1–39, discussed below—we read the plain language of section 38–1–29 to prohibit any attempt by private parties to vary by agreement the provisions set in place by the Legislature in the Mechanics' Liens Act.[3] Accordingly, to the extent the Completion Guaranty purports to alter the relative priority of the parties' liens on the subject property, it is unenforceable.

¶ 15 This construction of section 38–1–29 is "in harmony with other statutes in the same chapter." *LPI Servs. v. McGee,* 2009 UT 41, ¶ 11, 215 P.3d 135 (internal quotation marks omitted). The recently enacted section 38–1–39 now serves as a safety valve on the broad prohibition contained in section 38–1–29, allowing lienholders to waive or limit their rights under the Mechanics' Liens Act:

Notwithstanding Section 38–1–29, a written consent given by a lien claimant that waives or limits the lien claimant's lien rights is enforceable only if the lien claimant: (a)(i) executes a waiver and release that is signed by the lien claimant or the lien claimant's authorized agent; ... [and]

---

3. "The plain language controls the interpretation of a statute, and only if there is ambiguity do we look beyond the plain language to legislative history or policy considerations." *Vigos v. Mountainland Builders, Inc.,* 2000 UT 2, ¶ 13,

993 P.2d 207. Thus, "the remarks of sponsors of legislation are authoritative only to the extent that they are compatible with the plain language" of the statute. *United States v. Czubinski,* 106 F.3d 1069, 1070 (1st Cir.1997).

(b) receives payment of the amount identified in the waiver and release....

Utah Code Ann. § 38–1–39(2). This section took effect in 2007 and thus does not apply to the Completion Guaranty. However, it supports our reading of section 38–1–29. Subordination of a mechanic's lien "limits the lien claimant's lien rights." *Id.* Accordingly, section 38–1–39 sets out conditions under which the holder of a mechanic's lien may now, notwithstanding section 38–1–29, agree to subordinate or waive the priority of that lien. Lien Claimants argue, and we agree, that if, as Owners contend, section 38–1–29 permitted subordination agreements, section 38–1–39 would be superfluous.[4] *See LKL Assocs. v. Farley,* 2004 UT 51, ¶ 7, 94 P.3d 279 (stating that we interpret "statutes to give meaning to all parts, and avoid[ ] rendering portions of the statute superfluous").

¶ 16 Owners counter that Utah law "specifically sanctions the use of subordination agreements to protect Owners from situations similar to those presented in this case." In support, Owners cite our decision in *Richards v. Security Pacific National Bank,* 849 P.2d 606 (Utah Ct.App.1993). At issue in *Richards* was whether the doctrine of equitable subrogation granted the defendant's trust deed priority over the plaintiff's mechanic's lien. *See id.* at 608. The trust deed was recorded after the commencement of work on the property, and was thus subordinate to the mechanic's lien. *See id.* We affirmed the trial court's entry of summary judgment granting priority to the mechanic's lien. *See id.* at 607. In so doing, we discussed in dicta the methods by which a commercial lender could contractually protect itself against a prior mechanic's lien. We stated that lenders "can easily examine the property, ask specific questions regarding the existence of intervening lien holders, *acquire subordination agreements with any lienholders that exist,* or in many cases, assume the rights of the earlier lender by assignment." *Id.* at 612 (emphasis added). We agree with Owners that this language presupposes that mechanics' lien holders may legally subordinate their liens to construction or other loans. However, *Richards* was decided eight years before the enactment of section 38–1–29, which took effect on April 30, 2001, *see* Utah Code Ann. § 38–1–29. Accordingly, the statement in *Richards* on which Owners rely, while a correct statement of law at the time of its writing, was not correct during the window between the effective date of section 38–1–29 in 2001 and the effective date of section 38–1–39 in 2007.

¶ 17 In addition, Owners warn that if subordination agreements "are deemed unenforceable under section 38–1–29, construction lenders will be unable to protect their lien priority and the financing which serves as the lifeblood for construction projects will come to a halt." The Legislature appears to have anticipated and addressed this issue. With the passage of section 38–1–39, effective April 30, 2007, *see* Utah Code Ann. § 38–1–39 amend. notes, lien claimants may waive or subordinate their rights under the Mechanics' Liens Act so long as the conditions of that section are satisfied. *See id.* § 38–1–39(2).

¶ 18 Finally, Owners propose an alternate route to affirmance. They argue that, even if the subordination clause of the Completion Guaranty is not enforceable, an assignment of claims in the same paragraph is. By signing the document, they argue, Maestro assigned the Mechanic's Lien to First Utah Bank and thus could not later assign that same lien to Lien Claimants. The Completion Guaranty contains a passage stating that Maestro is assigning its claims against Hood to First Utah Bank to the extent necessary to ensure full repayment of the Construction Loan:

Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Loan.[5]

SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR. Guarantor agrees that the Loan, whether now existing or hereafter creat-

4. Owners' brief does not respond to this argument or mention section 38–1–39.

5. The entire paragraph reads:

Based on this provision, Owners argue that "[t]he obvious problem with [Lien Claimants'] claim is that their assignor, Maestro, had already assigned the very claims they are now attempting to pursue to [Owners]." Although Owners now describe this problem as "obvious," they did not raise it below until after the court heard oral argument on the parties' summary judgment motions and, perhaps as a result, the trial court did not rule on it.

¶ 19 In effect, Owners ask this court to affirm the trial court's ruling on an alternative ground. "[A]n appellate court *may* affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record," *Bailey v. Bayles*, 2002 UT 58, ¶ 13, 52 P.3d 1158 (second emphasis and internal quotation marks omitted). While we possess the authority to affirm on alternative grounds, "we are not obligated to exercise this authority." *O'Connor v. Burningham*, 2007 UT 58, ¶ 23, 165 P.3d 1214.

¶ 20 We decline to affirm the summary judgment in Owners' favor on this alternative ground for three reasons. First, Owners' factual theory is not particularly "apparent on the record." *See Bailey*, 2002 UT 58, ¶ 13, 52 P.3d 1158. Specifically, the assignment appears to be conditioned upon the occurrence of events about which the record on appeal is silent. The assignment follows a sentence addressing "insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditor, by voluntary liquidation, or otherwise." The sentence containing the assignment also refers to a "trustee in bankruptcy." Thus, the provision might plausibly be read to ensure only that First Utah Bank received full payment under the Construction Loan in the event of bankruptcy, insolvency, or liquidation proceedings. Yet Owners point to no record evidence that Hood was ever involved in such proceedings. More fundamentally, by its own terms, the assignment is "effective only for the purpose of assuring to Lender full payment in legal tender of the Loan." Again, Owners point to no record evidence that enforcement of the assignment at this juncture would result in First Utah Bank's receiving full payment of the Construction Loan, or even that First Utah Bank has not already received full payment of the Construction Loan through its non-judicial foreclosure.

¶ 21 Second, Owner's legal theory is not "apparent on the record." *See id.* Lien Claimants argue that even if the sentence upon which Owners now rely was effective to assign all Maestro's *claims* against Hood, it is not apparent from the wording of the provision that the assignment included Maestro's *lien rights*. Mechanics' liens are assignable. *See* Utah Code Ann. § 38–1–26 (2010) ("All liens under this chapter shall be assignable as other choses in action, and the assignee may commence and prosecute actions thereon in his own name in the manner herein provided."). However, the Completion Guaranty does not purport to assign the Mechanic's Lien. In fact, it never mentions a lien. Rather, the sentence in question states that Maestro "does hereby assign all *claims* which it may have or acquire against Bor-

ed, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Loan. *Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any as-signee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Loan.* If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.
(Emphasis added.)

rower." (Emphasis added.) Based on this wording, Lien Claimants argue that the clause assigned at most Maestro's claim against Hood personally, but not the Mechanic's Lien against the Property. Owners do not address this issue.

¶ 22 Indeed, the third and most important reason that we decline to affirm on Owners' proposed alternative appellate ground is the cursory nature of the briefing. Owners' one-page argument addressing the issue cites one case and one statute. The case, *SME Industries, Inc. v. Thompson, Ventulett, Stainbeck & Associates,* 2001 UT 54, 28 P.3d 669, discusses the law of assignments generally. *See id.* ¶¶ 11–16. The statute, Utah Code section 38–1–26, states that mechanic's liens are assignable, *see* Utah Code Ann. § 38–1–26. While these authorities are relevant, they are only starting points. The brief does not begin to address the factual and legal complications noted above. Accordingly, given the ambiguities in the record and the potential difficulties with Owners' alternative legal theory, we decline to affirm on that theory and express no opinion with respect to its merits.

¶ 23 Because we hold as a matter of law that the subordination clause in the Completion Guaranty is unenforceable under section 38–1–29, we need not reach the merits of Lien Claimants' second issue on appeal, that the trial court erred in rejecting on summary judgment Lien Claimants' claim that Maestro was fraudulently induced to sign the Completion Guaranty.

## CONCLUSION

¶ 24 We conclude that the subordination agreement within the Completion Guaranty was unenforceable under Utah Code section 38–1–29. Accordingly, we need not reach Lien Claimants' second claim of error. In addition, we decline to affirm on Owners' alternative ground advanced on appeal. Therefore, we reverse the summary judg-

ment entered in favor of Owners and remand the case for further proceedings consistent with this opinion.

¶ 25 I CONCUR: MICHELE M. CHRISTIANSEN, Judge.

DAVIS, Presiding Judge (dissenting):

¶ 26 I do not agree that the statutory scheme at issue here necessarily prohibits subordination agreements between construction financing providers and contractors. Further, even were I to completely agree with the majority opinion's statutory analysis, I think Owners are entitled to restitution under the facts of this case.

¶ 27 First, I do not agree that the plain language of Utah Code section 38–1–29 necessarily leads to the interpretation set forth in the majority opinion. The statute states, "The applicability of the provisions of this chapter, including the waiver of rights or privileges granted under this chapter, may not be varied by agreement." Utah Code Ann. § 38–1–29 (2010). Thus, the statute provides that "the waiver of rights or privileges granted under [the Mechanics' Liens Act]" is itself one of the provisions of the Act that may not be made inapplicable by agreement. That is, the language states not that the applicability of *rights* granted under the Act cannot be altered, but that the applicability of *the waiver of* those rights cannot be altered, thus indicating that at least some sort of waiver was allowed under the Act at the time this statute was created in 2001. In sum, although I understand the majority opinion's logic in reading the statute in a way that prohibits the waiver of any rights granted under the Act, I think the plain language of the statute also indicates that there are at least some waivers of those rights that are provided for within the Act. Due to such inconsistent interpretations, the language of the statute is, at best, unclear.[1]

1. "When faced with a question of statutory construction, we look first to the plain language of the statute. If the statute is unclear, we then resort to legislative history and purpose for guidance." *Strawberry Elec. Serv. Dist. v. Spanish Fork City,* 918 P.2d 870, 875 (Utah 1996) (citations omitted); *see also Brent Brown Dealerships v. Tax Comm'n, Motor Vehicle Enforcement Div.,*

2006 UT App 261, ¶ 36, 139 P.3d 296 ("Ambiguity in a statute allows us to look beyond a statute's plain language and take into account legislative history and public policy considerations...."). *See generally Li v. Zhang,* 2005 UT App 246, ¶ 8, 120 P.3d 30 ("[The] existence of two reasonable, yet conflicting, interpretations of [a] statute ren-

¶ 28 Second, I do not agree that the later addition of section 38–1–39 in 2006 was the legislature's attempt to create a "safety valve" on the total prohibition against any form of lien waiver. From the comments made during legislative debates when this provision was being considered, it is clear that the legislators understood the provision was not starting to allow some previously forbidden lien waivers, but was instead just an attempt to standardize certain types of waivers. *See* Recording of Utah Senate Debates, 2006 Leg., Gen. Sess. (Jan. 16, 2006) (statement of Sen. Hatch), *available at* http://le.utah.gov/asp/audio/index.asp?Sess=2006GS&Day=0&Bill=SB0161S01&House=S ("As a person that deals with these lien waivers all the time in my business, I commend Senator Jenkins as bringing some standardization to it … because … we see every form from written on the back of a napkin to a fifty-page legal document, and I think this makes a lot of sense and I would urge your support of the bill."); Recording of Utah Senate Debates, 2006 Leg., Gen. Sess. (Jan. 17, 2006) (statement of Sen. Jenkins), *available at* http://le.utah.gov/asp/audio/index.asp?Sess=2006GS&Day=0&Bill=SB0161S01&House=S ("Senate Bill 161 is the bill that we talked about yesterday afternoon late in regards to lien waivers and the fact that we are redoing lien waivers and the way they're done. It makes a couple of standard forms and also addresses restrictive endorsements on the backs of the checks."). Because the legislature had standardization in mind when enacting this statute, I do not agree with the majority opinion that reading section 38–1–29 as allowing subordination agreements would by any means render section 38–1–39 superfluous.

¶ 29 Third, section 38–1–39 applies to only those lien waivers that are made after a lien claimant has received full payment for the amount of the claim that he is waiving. *See* Utah Code Ann. § 38–1–39(2) (2010). Therefore this section does not address the situation here, where a construction financing provider is seeking lien priority as a condition to financing a construction project. Thus, the section does not resolve Owners' concerns regarding the chilling effect our decision will likely have on the ability to obtain construction financing—a very serious concern in my estimation.

¶ 30 Fourth, even if the majority opinion's interpretation of the Mechanics' Liens Act is correct and the subordination agreement is unenforceable, Owners should be entitled to restitution under the circumstances here, where their predecessor in interest made the construction loan only after securing the promises made by Maestro in the subordination agreement.

> A party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if (a) he was excusably ignorant of the facts or of legislation of a minor character, in the absence of which the promise would be enforceable. . . .

Restatement (Second) of Contracts § 198 (1981); *see also id.* § 199 ("A party has a claim in restitution for performance that he has rendered under or in return for a promise that is unenforceable on grounds of public policy if he did not engage in serious misconduct and … allowance of the claim would put an end to a continuing situation that is contrary to the public interest."). *See generally id.* § 178(1) ("A promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable. . . ."). The funding for the project, and the resulting job for Maestro, would not have existed but for Maestro's signing of the subordination agreement. I think it patently unjust for Maestro to be allowed to ultimately secure a benefit via signing the subordination agreement yet at the same time be allowed to excuse the performance it promised by arguing that the agreement was contrary to statutory provisions.