**2013 UT App 26**

## THE UTAH COURT OF APPEALS

MITCH TOMLINSON,

*Plaintiff and Appellant,*

*v.*

NCR CORPORATION,

*Defendant and Appellee.*

Opinion
No. 20110554-CA
Filed January 31, 2013

Third District, Salt Lake Department
The Honorable Vernice Trease
No. 090905865

Mitch Tomlinson, Appellant Pro Se
Michael E. Blue and Liesel B. Stevens, Attorneys for Appellee

JUDGE CAROLYN B. MCHUGH authored this Opinion,
in which JUDGES GREGORY K. ORME
and STEPHEN L. ROTH concurred.

McHUGH, Judge:

¶1     Mitch Tomlinson appeals from the dismissal of all but two claims in his amended complaint against NCR Corporation. He also appeals from the trial court's subsequent order granting summary judgment in favor of NCR on his remaining claims of wrongful termination and breach of the covenant of good faith and fair dealing. Finally, Tomlinson asserts that the trial court erred in denying his motion to alter or amend judgment. We affirm in part, and reverse and remand in part.

BACKGROUND

¶2     NCR terminated Tomlinson's employment as a customer engineer on May 5, 2005. Following the termination, NCR reported to the Salt Lake City Police Department that Tomlinson had stolen NCR's property and assaulted a manager. Tomlinson disputed the allegations, and it appears from the record that Tomlinson was not charged with any crime. At the time of his termination, Tomlinson had been employed with NCR for about ten years.

¶3     On April 9, 2009, Tomlinson, appearing pro se, filed a complaint against NCR, alleging several causes of action; he later filed an amended complaint (the Amended Complaint). NCR moved to dismiss Tomlinson's Amended Complaint, arguing that it failed to state any claims upon which relief could be granted under rule 12(b)(6) of the Utah Rules of Civil Procedure. After a hearing, the trial court dismissed seven of Tomlinson's claims without prejudice but allowed him to proceed with two of his claims.[1] Despite the trial court's explanation that Tomlinson could "file a motion" to amend the complaint, he did not file a second amended complaint.

¶4     Thereafter, the trial court granted summary judgment for NCR on Tomlinson's remaining claims of wrongful discharge and breach of the covenant of good faith and fair dealing. In response, Tomlinson filed a motion to alter or amend judgment under rule 59 of the Utah Rules of Civil Procedure. The trial court denied that motion, and Tomlinson now appeals.[2]

---

1. The trial court also dismissed three of Tomlinson's claims with prejudice based on Tomlinson's stipulation that they were time barred. Tomlinson does not challenge the dismissal of these claims on appeal.

2. Because we reverse the trial court's grant of summary judgment, we need not address Tomlinson's claim that the trial court erred in denying his request to alter or amend judgment.

ISSUES AND STANDARDS OF REVIEW

¶5     Tomlinson contends that the trial court erred in dismissing seven of his claims under rule 12(b)(6) of the Utah Rules of Civil Procedure either as inadequately pleaded or as barred by the Workers' Compensation Act. Because a rule 12(b)(6) dismissal is a question of law, "'we give the trial court's ruling no deference and review it under a correctness standard.'" *Sony Elecs., Inc. v. Reber*, 2004 UT App 420, ¶ 8, 103 P.3d 186 (quoting *St. Benedict's Dev. Co. v. St. Benedict's Hosp.*, 811 P.2d 194, 196 (Utah 1991)).

¶6     Tomlinson also appeals the summary judgment in favor of NCR on his claims of wrongful discharge and breach of the covenant of good faith and fair dealing. "Because summary judgment is granted as a matter of law, we review the trial court's ruling for correctness." *Harding v. Atlas Title Ins. Agency, Inc.*, 2012 UT App 236, ¶ 5, 285 P.3d 1260 (citation and internal quotation marks omitted). In doing so, "[w]e examine the evidence in the light most favorable to the losing party, and if that evidence and the reasonable inferences drawn therefrom would support a judgment in favor of the losing party, we must reverse." *Id.* (emphasis, citation, and internal quotation marks omitted).


ANALYSIS

I. Inadequately Pleaded Claims

¶7     First, Tomlinson argues that the trial court erred when it dismissed five of his claims under rule 12(b)(6) of the Utah Rules of Civil Procedure for failure to state a claim on which relief could be granted. The trial court noted that the Amended Complaint contained many conclusions but few facts to support them. The trial court also explained that it could not consider the additional

facts Tomlinson asserted at the hearing because they could not be "reasonably inferr[ed] from . . . the [A]mended [C]omplaint."[3]

¶8     "A complaint that alleges the facts and sets forth the legal basis for an available legal remedy adequately states a claim upon which relief can be granted." *Mack v. Utah State Dep't of Commerce*, 2009 UT 47, ¶ 17, 221 P.3d 194. Thus, when reviewing a trial court's dismissal of a complaint under rule 12(b)(6), we "must accept the material allegations of the complaint as true, and the trial court's ruling should be affirmed only if it clearly appears the complainant can prove no set of facts in support of his or her claims." *Mackey v. Cannon*, 2000 UT App 36, ¶ 9, 966 P.2d 1081; *see also Sony Elecs.*, 2004 UT App 420, ¶ 10 (stating that dismissal is appropriate only if "'it clearly appears that the . . . plaintiffs would not be entitled to relief under the facts alleged or under any state of facts they could prove to support their claim.'" (quoting *Prows v. State*, 822 P.2d 764, 766 (Utah 1991))).

¶9     The Amended Complaint alleges that (1) NCR's written employee policies created an employment contract, (2) NCR's termination of Tomlinson violated the procedures set forth in those policies, (3) NCR reported to the Salt Lake Police department that Tomlinson had stolen NCR's property and assaulted an NCR representative, (4) the allegations in the police report were false, (5) NCR knew the allegations were false, (6) some of the NCR property was in the possession of an NCR manager, (7) NCR wrote false performance evaluations of Tomlinson, (8) NCR had a business relationship with Tomlinson and handled money on his behalf, and

---

3. On appeal, Tomlinson also asserts facts not pleaded in the complaint. Although our review under rule 12(b)(6) of the Utah Rules of Civil Procedure assumes the facts alleged in the Amended Complaint to be true, "'we need not accept extrinsic facts not pleaded nor need we accept legal conclusions in contradiction of the pleaded facts.'" *See Osguthorpe v. Wolf Mountain Resorts, LC*, 2010 UT 29, ¶ 10, 232 P.3d 999 (quoting *Allred v. Cook*, 590 P.2d 318, 319 (Utah 1979)).

(9) NCR's actions damaged Tomlinson's reputation with NCR's employees and customers. We assume these allegations are true in our review of the trial court's dismissal of Tomlinson's claims under rule 12(b)(6). *See Mackey*, 2000 UT App 36, ¶ 9. Despite that assumption, we agree with the trial court that Tomlinson inadequately pleaded many of his claims.

A. Breach of Fiduciary Duty

¶10    We first review Tomlinson's argument that he adequately pleaded his claim of breach of fiduciary duty. As a general rule, "in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary." *First Sec. Bank of Utah N.A. v. Banberry Dev. Corp.*, 786 P.2d 1326, 1333 (Utah 1990) (citation and internal quotation marks omitted). A fiduciary relationship may arise when one person has "a duty to act primarily for the benefit of another" and one party is the other's superior. *Id.* (citation and internal quotation marks omitted).

¶11    Here, the only facts asserted in the Amended Complaint to support the breach of fiduciary duty claim are that NCR had a "business relationship" with Tomlinson and that NCR "handled money on [his] behalf." However, there is no allegation that NCR mishandled or misappropriated any money belonging to Tomlinson. Thus, even assuming that NCR had a fiduciary duty to handle Tomlinson's money appropriately, there is no allegation that it breached that duty. As a result, the Amended Complaint fails to allege facts which could support a breach of fiduciary duty claim.

¶12    On appeal, Tomlinson also argues that "an [employee's] agreement to share the losses of the employer" creates a fiduciary duty. However, we need not consider this argument because Tomlinson did not raise it before the trial court. *See LaChance v. Richman*, 2011 UT App 40, ¶ 15, 248 P.3d 1020 ("Generally, a party cannot raise an issue for the first time on appeal."). Even if we were to address the argument on the merits, Tomlinson's Amended Complaint fails to state a claim for breach of fiduciary duty. In

*McLaughlin v. Schenk*, 2009 UT 64, 220 P.3d 146, the Utah Supreme Court concluded that a closely held corporation may have a fiduciary duty under some circumstances that would prevent the termination of an at-will employee who is also a stockholder. *Id.* ¶ 27. However, such a discharge does not constitute a breach of fiduciary duty unless "a shareholder's reasonable expectations were thwarted." *Id.* (citation and internal quotation marks omitted). The Amended Complaint's reference to a "business relationship" and "handling money" does not support an inference that Tomlinson was a shareholder in NCR, that he shared in NCR's profits and losses, that his "reasonable [investment] expectations were thwarted" by the termination, or that NCR is a closely held corporation. *See id*. Thus, "'it clearly appears that [Tomlinson] . . . would not be entitled to relief under the facts alleged'" in support of this claim. *See Sony Elecs., Inc. v. Reber*, 2004 UT App 420, ¶ 10, 103 P.3d 186 (quoting *Prows*, 822 P.2d at 766).

B. Interference with Economic Relations

¶13    Next, Tomlinson argues that the trial court erred in dismissing his claim of interference with economic relations because he "reasonably expected" to benefit in the future from his established relationship with NCR's customers. The elements of interference with economic relations are that "the defendant intentionally interfered with the plaintiff's existing or potential economic relations . . . for an improper purpose or by improper means . . . causing injury to the plaintiff." *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 20, 116 P.3d 323 (citation and internal quotation marks omitted). The Amended Complaint fails to identify any existing or potential economic relationship between Tomlinson and NCR's customers, and does not allege that NCR interfered for an improper purpose or by improper means. Thus, even applying a liberal construction of the facts alleged and making "all the reasonable inferences to be drawn from the facts in a light most favorable to [Tomlinson]," the Amended Complaint does not state a claim upon which relief may be granted for interference with economic relations. *See Anderson v. Dean Witter Reynolds, Inc.*, 841 P.2d 742, 744 (Utah Ct. App. 1992).

C. Abuse of Process

¶14    Tomlinson next asserts that the trial court erred in dismissing his abuse of process claim. "'A claim for abuse of process requires the plaintiff to show (1) that the defendant used legal process, (2) to accomplish an improper purpose or purpose for which that process was not designed, (3) causing the plaintiff's harm.'" *Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 37 n.6, 285 P.3d 1157 (quoting *Mountain W. Surgical Ctr., LLC v. Hospital Corp. of Utah*, 2007 UT 92, ¶ 11, 173 P.3d 1276). To adequately plead a claim for abuse of process, "'a party must allege both an ulterior purpose and a wilful act in the use of the process not proper in the regular conduct of the proceeding.'" *See id.* (quoting *Hatch v. Davis* (*Hatch II*), 2006 UT 44, ¶ 36, 147 P.3d 383).

¶15    To satisfy the wilful act requirement, the party must allege conduct, other than the pursuit of the legal process itself, that could support a finding that the actor misused the process in order to achieve some ulterior objective. *See id.* In other words, "'[u]se of legal process with a bad motive alone'" is not enough. *See id.* (quoting *Hatch II*, 2006 UT 44, ¶ 39). The party must also allege that the actor has engaged in independent conduct which confirms "'his improper ulterior motive for employing legal process against the plaintiff.'" *See id.* (quoting *Hatch II*, 2006 UT 44, ¶ 40). The improper or "ulterior purpose" element "usually involves coercing another through the use of process to obtain something . . . such as the surrender of property or the payment of money, or compelling the victim to do something which he would not otherwise be legally obligated to do." *Puttuck v. Gendron*, 2008 UT App 362, ¶ 14, 199 P.3d 971 (omission in original) (brackets, citations, and internal quotation marks omitted). Thus, the key to the ulterior purpose element is that it is "an object for the process abuser's collateral advantage." *Id.* (citation and internal quotation marks omitted).

¶16    The Amended Complaint alleges that NCR made a false police report and then advised Tomlinson's coworkers of the police investigation, thereby injuring his reputation. NCR asserts that even accepting these allegations as true, the Amended Complaint

does not allege an ulterior purpose sufficient to support a claim of abuse of process. Tomlinson's allegation that NCR filed the false police report in order to hurt his reputation does not alone state a claim for abuse of process because "allegations of intimidation and desire to hurt a reputation, alone, do not suggest an advantage or gain [that NCR] would receive collateral to the proceedings." *See id.* ¶ 16. Indeed, "'[i]n an action for abuse of process, . . . it is immaterial whether such proceeding was baseless or not.'"[4] *Id.* ¶ 13 (alteration in original) (quoting *Hatch v. Davis* (*Hatch I*), 2004 UT App 378, ¶ 33, 102 P.3d 774, *aff'd*, 2006 UT 44, 147 P.3d 383). Instead, Tomlinson must allege "an advantage or gain [that NCR] would receive collateral to the proceedings." *See id.* ¶ 16. *Compare id.* ¶¶ 15–16 (affirming the dismissal of an abuse of process claim in which the defendant allegedly filed a false counterclaim and gave false testimony, causing the plaintiff to incur attorney fees, because the complaint had not alleged an "ulterior purpose or collateral advantage that [the defendant] hoped to gain"), *with Hatch I*, 2004 UT App 378, ¶ 35 (holding that the defendant had pleaded an "ulterior motive or purpose" where the plaintiff had initiated actions against the defendant "in federal and state court . . . in order to . . . intimidate the residents of the town as well as the town council to comply with [Plaintiff's] narrow and peculiar political and philosophical positions." (alteration in original)). Because he has failed to allege any such advantage or gain, the Amended Complaint does not state a claim for abuse of process.

---

4. The alleged malicious intent on the part of NCR falls more appropriately within a claim of malicious prosecution, under which an actor may be liable for initiating or procuring "criminal proceedings against another who is not guilty of the offense charged . . . if (a) [the accuser] initiates or procures the proceedings without probable cause and primarily for a purpose other than that of bringing an offender to justice, and (b) the proceedings have terminated in favor of the accused." Restatement (Second) of Torts § 653 (1977); *accord Gilbert v. Ince*, 1999 UT 65, ¶ 19, 981 P.2d 841 (acknowledging the Restatement definition of malicious prosecution of criminal actions).

*See MBNA Am. Bank, N.A. v. Goodman*, 2006 UT App 276, ¶ 6, 140 P.3d 589 (stating that to support a claim for relief, a plaintiff "must have alleged sufficient facts . . . to satisfy each element" of a claim).

## D. Civil Conspiracy

¶17    Next, Tomlinson asserts that the trial court improperly dismissed his civil conspiracy claim. A claim of civil conspiracy requires proof of the following five elements:

> (1) a combination of two or more persons, (2) an object to be accomplished, (3) a meeting of the minds on the object or course of action, (4) one or more unlawful, overt acts, and (5) damages as a proximate result thereof.

*Peterson v. Delta Air Lines, Inc.*, 2002 UT App 56, ¶ 12, 42 P.3d 1253 (citation and internal quotation marks omitted).

¶18    The Amended Complaint does not identify "two persons," does not allege a "meeting of the minds" on a common "object or course of action," and does not allege facts that support these elements. Instead, the allegations of the Amended Complaint identify NCR and its employees as the only actors. As a general rule, "it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself," because they do not constitute two separate persons. *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000). In addition, Tomlinson makes no attempt to identify the common objective of the alleged conspiracy or to identify an act taken in furtherance of it. Accordingly, the trial court properly dismissed Tomlinson's civil conspiracy claim as failing to state a claim upon which relief can be granted. *See* Utah R. Civ. P. 12(b)(6).

## E. Intentional Infliction of Emotional Distress

¶19    Tomlinson also challenges the dismissal of his claim for intentional infliction of emotional distress. According to NCR, the

conduct alleged in the Amended Complaint does not arouse sufficient "outrage or revulsion" to support the claim.[5] That position is supported by our decision in *Magistro v. Day*, 2010 UT App 397U (mem.). There, the plaintiff asserted a claim of intentional infliction of emotional distress based on allegations that the defendant had filed a false police complaint against him. *See id.* para. 4. We upheld the trial court's summary judgment in favor of the defendant on that claim, stating "that '[a] mere allegation of improper filing of a lawsuit or the use of legal process against an individual does not state a claim for outrageous or intolerable conduct and, as such, is not redressable by a cause of action for intentional infliction of emotional distress.'" *Id.* (alteration in original) (quoting *Anderson Dev. Co. v. Tobias*, 2005 UT 36, ¶ 55, 116 P.3d 323). Likewise, in *Zoumadakis v. Uintah Basin Medical Center, Inc.*, 2005 UT App 325, 122 P.3d 891 (mem.), we concluded that alleged defamatory statements coupled with termination of employment did not constitute the "kind of outrageous conduct required to support the cause of action" of intentional infliction of emotional distress. *See id.* ¶ 8.

¶20   Based on these decisions, we agree with NCR that Tomlinson's Amended Complaint, which alleges that NCR made false statements to the police and wrongfully terminated his employment, fails to state a claim for intentional infliction of emotional distress.[6]

---

5. Because we decide this issue under rule 12(b)(6) we need not consider NCR's argument that the claim was barred under the Workers' Compensation Act. *See Olsen v. Chase*, 2011 UT App 181, ¶ 19, 270 P.3d 538 ("While we possess the authority to affirm on alternative grounds, 'we are not obligated to exercise this authority.'" (quoting *O'Connor v. Burningham*, 2007 UT 58, ¶ 23, 165 P.3d 1214)).

6. Tomlinson's intentional infliction of emotional distress claim also fails because he has not alleged that he actually suffered extreme emotional distress as a result of NCR's conduct. *Compare*
(continued...)

## II. Negligence Claims

¶21    Tomlinson next argues that the trial court erred in determining that the Workers' Compensation Act precluded his claims of "negligent hiring, supervision, or retention of [an] employee" and gross negligence. The Workers' Compensation Act provides employees with "the exclusive remedy against the employer . . . in place of any and all other civil liability" for accidental injuries sustained "in the course of or because of or arising out of the employee's employment." Utah Code Ann. § 34A-2-105 (LexisNexis 2011);[7] *Mounteer v. Utah Power & Light Co.*, 823 P.2d 1055, 1057 (Utah 1991). "[E]ach provision for compensation relates to a diminution or loss of earning power caused by a physical or mental injury or by death sustained in the work place." *Mounteer*, 823 P.2d at 1057. "The primary objective of workers' compensation has been to remove industrial negligence, in all its forms, from the concept of the law of tort." *Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, ¶ 17, 203 P.3d 962 (citation and internal quotation marks omitted).

¶22    However, the act does not preempt all claims. For example, it does not preclude a defamation action for damages to one's

---

6. (...continued)
*Schuurman v. Shingleton*, 2001 UT 52, ¶¶ 5, 25, 26 P.3d 227 (holding that claims of a destroyed marriage, failing to seek treatment for an eating disorder and depression, and the need for future counseling services were insufficient to maintain a claim of intentional infliction of emotional distress), *with Walter v. Stewart*, 2003 UT App 86, ¶ 29, 67 P.3d 1042 (holding that emotional pain and a need for counseling combined with "physical pain, medical bills, loss of employment, and a need for sexual therapy" supported a claim of intentional infliction of emotional distress).

7. Because statutory amendments made subsequent to the events alleged in the Amended Complaint are not material to our analysis, we cite the current version of the Utah Code for the convenience of the reader.

reputation.[8] *See Mounteer*, 823 P.2d at 1058. Likewise, the exclusive remedy provision does not bar all claims for physical or mental injuries caused by intentional torts. *See Helf*, 2009 UT 11, ¶ 18. In *Helf*, our supreme court clarified that such claims are not barred by the Workers' Compensation Act if the employee can show an "intent to injure" by establishing "a specific mental state in which the actor knew or expected that injury would be the consequence of his action." *Id.* ¶ 43. Indeed, "the employer must know or expect that a specific employee will be injured doing a specific task." *Id.*

¶23   NCR asserts that the trial court correctly dismissed this claim because it is a negligence claim preempted by the Workers' Compensation Act. In contrast, Tomlinson argues that the Workers' Compensation Act does not bar his negligence claims because he alleges that NCR "acted with willful intent." *See id*. We need not reach this issue because, even if not preempted, Tomlinson's negligence claims do not assert facts on which relief could be granted. *See Bailey v. Bayles*, 2002 UT 58, ¶ 13, 52 P.3d 1158 ("[A]n appellate court may affirm the judgment appealed from if it is sustainable on any legal ground or theory apparent on the record." (citation and internal quotation marks omitted)).

¶24   The elements of negligence are: (1) "[T]he defendant owed the plaintiff a duty," (2) "the defendant breached that duty," (3) "the breach of duty was the proximate cause of the plaintiff's injury," and (4) "the plaintiff in fact suffered injuries or damages." *Webb v. University of Utah*, 2005 UT 80, ¶ 9, 125 P.3d 906 (citation and internal quotation marks omitted). The tort of negligent hiring, supervision, or retention is an exception to the general rule "that there is no affirmative duty to control the conduct of a third party so as to prevent the third party from causing harm to another." *See* Restatement (Third) of Torts § 41, cmt. a. (2012). Thus, to state such a claim, Tomlinson must allege facts that, if true, would "show that

---

8. The trial court dismissed Tomlinson's defamation claim as barred by the applicable statute of limitations. Tomlinson does not challenge that decision on appeal.

[NCR] had a duty to protect him from harm at the hands of its employees, a negligent breach of that duty, and the harm and damages caused by that breach." *See J.H. ex rel D.H. v. West Valley City*, 840 P.2d 115, 126 (Utah 1992). While the Amended Complaint need not prove these essential elements, it must set forth facts sufficient to state a claim for negligence. *See Williams v. Bench*, 2008 UT App 306, ¶ 21, 193 P.3d 640 ("We will affirm the rule 12(b)(6) dismissal of a negligence claim if it appears to a certainty that the plaintiff would not be entitled to relief under any state of facts which could be proved in support of its claim." (brackets, citation, and internal quotation marks omitted)).

¶25    Tomlinson's negligent hiring, supervision, or retention claim contains one paragraph incorporating all of the prior paragraphs of the Amended Complaint by reference, and then adding two additional paragraphs, which state:

45.    Defendant(s) retained employee's and supervisors that did not exercise ordinary or reasonable care when evaluating Tomlinson's performance.

46.    Tomlinson's supervisors did not adhere to the standards set in the employment contract when evaluating Tomlinson's performance and reporting.

¶26    While the Amended Complaint alleges that NCR's employees and supervisors were negligent themselves, it does not allege any fact that could support a claim that NCR was "negligen[t] in hiring, supervising, or retaining its employees" or that NCR's negligence in doing so "proximately caused [Tomlinson] harm." *See Retherford v. AT&T Commc'ns*, 844 P.2d 949, 967 (Utah 1992); *see also Dee v. Johnson*, 2012 UT App 237, ¶ 4, 286 P.3d 22 ("Proximate cause is 'that cause which, in a natural and continuous sequence, unbroken by any new cause, produced the injury, and without which the injury would not have occurred.'"

(quoting *Bunker v. Union Pac. R.R. Co.*, 114 P. 764, 775 (Utah 1911))). As a result, Tomlinson has failed to state a claim upon which relief could be granted for negligent hiring, supervision, or retention.

¶27 Next, we evaluate Tomlinson's gross negligence claim. "Gross negligence is the failure to observe even slight care; it is carelessness or recklessness to a degree that shows utter indifference to the consequences that may result." *Pearce v. Utah Athletic Found.*, 2008 UT 13, ¶ 24, 179 P.3d 760 (citation and internal quotation marks omitted). Tomlinson's gross negligence claim incorporates by reference all prior paragraphs and further states that NCR acted "intentionally, willfully and maliciously," and was "careless and reckless" when it "claimed that Tomlinson had received parts that were in the possession of his immediate supervisor, wrote false performance evaluations, gave false information regarding Tomlinson's termination and fabricated allegations against Tomlinson." Nevertheless, Tomlinson fails to identify any tort injury proximately caused by the alleged reckless conduct. Therefore, Tomlinson has failed to state a gross negligence claim. *See Steffenson v. Smith's Mgmt. Corp.*, 820 P.2d 482, 486 (Utah Ct. App. 1991) (stating that a negligence claim requires showing that "the breach of the duty was the proximate cause of the plaintiff's injury; and that there was in fact injury"); *accord SME Indus., Inc. v. Thompson, Ventulett, Stainback & Assocs., Inc.*, 2001 UT 54, ¶ 32, 28 P.3d 669 ("[E]conomic damages are not recoverable in negligence absent physical property damage or bodily injury."), *holding modified by Sunridge Dev. Corp. v. RB & G Eng'g, Inc.*, 2010 UT 6, 230 P.3d 1000.

## III. Summary Judgment

¶28 Tomlinson next argues that the trial court erred in granting summary judgment in favor of NCR on his claims of wrongful discharge and breach of the covenant of good faith and fair dealing (the Good Faith Covenant). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Utah R. Civ. P. 56(c).

¶29    The trial court announced its summary judgment ruling from the bench, stating that "as a matter of law there was no implied contract limiting the right of NCR to terminate Mr. Tomlinson." The court's decision is based on the presumption under Utah law "that all employment relationships entered into for an indefinite period of time are at-will," which means that an employer "may terminate the employment for any reason (or no reason) except where prohibited by law." *See Hansen v. America Online, Inc.*, 2004 UT 62, ¶ 7, 96 P.3d 950. That presumption can be overcome by proof that the parties entered into an "implied or express agreement that the employment may be terminated only for cause or upon satisfaction of another agreed-upon condition." *Fox v. MCI Commc'ns Corp.*, 931 P.2d 857, 859 (Utah 1997). Where there is no express contract altering the at-will relationship, "the employee has the burden of establishing the existence of an implied-in-fact contract provision" by showing that "the parties nevertheless agreed that the employment would not be at will." *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1001 (Utah 1991); *see also Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1044 (Utah 1989) (stating that the at-will presumption may "be overcome by an affirmative showing by the plaintiff that the parties expressly or impliedly intended a specified term or agreed to terminate the relationship for cause alone").

¶30    To prove the existence of an implied contract the employee must make an affirmative showing that "meet[s] the requirements for an offer of a unilateral contract." *See Johnson*, 818 P.2d at 1002; *Berube*, 771 P.2d at 1044. This requires "a manifestation of the employer's intent that is communicated to the employee and sufficiently definite to operate as a contract provision," such that "the employee can reasonably believe that the employer is making an offer of employment other than employment at will." *Id.* (footnote omitted). "The existence of such an agreement is a question of fact which turns on the objective manifestation of the parties' intent." *Id.* at 1001. Therefore, "it is 'primarily a jury question.'" *Cabaness v. Thomas*, 2010 UT 23, ¶ 56, 232 P.3d 486 (quoting *Johnson*, 818 P.2d at 1001). However, a court may decide the issue as a matter of law "if the evidence presented is such that

no reasonable jury could conclude that the parties agreed to limit the employer's right to terminate the employee." *Johnson*, 818 P.2d at 1001.

¶31 Here, the trial court concluded that no reasonable jury could find that NCR agreed to limit its right to fire Tomlinson at-will. Tomlinson challenges that decision, claiming that policies contained within NCR's Corporate Management Policy Manual (the Manual), created a disputed issue of material fact concerning NCR's intent. Specifically, the Amended Complaint infers that NCR's Corporate Management Policy Number 210 (Policy 210) overcame the at-will presumption because it "specifically stated the procedures to be required to be performed before NCR could terminate [Tomlinson's] employment." At the summary judgment hearing, Tomlinson further explained that NCR's Corporate Management Policy Number 422 (Policy 422) distinguishes between a "core workforce who perform ongoing work which is necessary for the continuing operation of the business" and a "workforce buffer that sets the staffing arrangements that will allow for expansion and contraction." Tomlinson notes that under Policy 422 "the only at will employees are the . . . workforce buffer." Therefore, he argues that, as a "core" employee, Policy 210 "defined the steps required in order to terminate [him]."[9] Although NCR contends that Tomlinson was a tactical employee, and therefore part of the workforce buffer, it further asserts that the

---

9. In opposition to summary judgment, Tomlinson also relied on NCR's Corporate Management Policy Number 209 which addresses "Performance Management" and instructs that

> [a]ll NCR Corporation people are to receive a thorough explanation of the results expected from them at the beginning of each performance cycle, interim reviews of progress towards those expected results during the performance period, and a comprehensive appraisal of their performance in relation to those expectations at the close of each performance period.

issue is not material because all of its employees are terminable at-will.[10]

A. Tomlinson's Employment Classification

¶32　In support of his argument that he was a core employee, Tomlinson provided a copy of his "employee profile" that identifies him as a "salaried non-exempt employee" and indicates that he was expected to work forty hours per week indefinitely. In addition, he attached Policy 422 to his brief in opposition of summary judgment, which describes the core workforce as "employees who perform ongoing work which is necessary for the continuing operation of the business,"[11] and defines full-time, core employees as "expected to work the regular number of scheduled work hours established for the business unit." Because Tomlinson produced evidence that he was a long-term employee who performed ongoing, full-time work, he came forward with evidence that created a disputed issue of fact as to whether he was a core employee.

¶33　Nonetheless, to survive summary judgment, that disputed fact must be material. *See* Utah R. Civ. P. 56 (allowing summary judgment if "there is no genuine issue as to any material fact"). Therefore, Tomlinson was required to produce sufficient evidence from which a "reasonable jury could conclude that the parties

---

10. Although NCR also claims that Tomlinson was not aware of the policy during his employment, we decline to consider this argument because it is raised for the first time on appeal. *See State v. Moa*, 2012 UT 28, ¶ 23, 282 P.3d 985 ("As a general rule, in order to preserve an issue for appeal, the issue must be presented to the district court in such a way that the district court has an opportunity to rule on that issue." (brackets, citation, and internal quotation marks omitted)).

11. NCR argues that Policy 422 was adopted four years before Tomlinson was hired, but does not indicate that it was subsequently revoked or amended.

agreed to limit the employer's right to terminate" full-time, core employees. *See Johnson*, 818 P.2d at 1001. "Relevant evidence of the intent of the parties usually 'includes the language of the manual itself, the employer's course of conduct, and pertinent oral representations.'" *Cabaness*, 2010 UT 23, ¶ 57 (quoting *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 56 (Utah 1991)). As discussed, Tomlinson points to two aspects of the Manual that he claims evidences NCR's intent to limit its right to terminate core employees. First, he contends that by expressly designating certain employees as at-will, NCR indicated its intent to fire employees not specifically designated as at-will only for cause. Second, Tomlinson claims that NCR was bound by Policy 210 from terminating him without first following certain procedures. We address each of these arguments in turn.

B. Limited At-Will Statements

¶34    In support of his claim that NCR could terminate core employees only for cause, Tomlinson relies on the Manual's express designation of only a subset of NCR employees as being terminable at-will. Policy 422 explains that NCR's core workforce is comprised of full-time employees, part-time employees, and interns. The "workforce buffer" includes temporary or tactical workforce employees, contract personnel, and vendors. After explaining this distinction, Policy 422 sets forth "Conditions Governing U.S. Tactical Workforce," which states, "Employment at NCR is AT WILL. No statement in this policy implies any guarantee of employment. Completion of an individual's temporary employment period is always dependent on the Company's needs and the individual's performance" (the At-Will Statement). The At-Will Statement expressly governs only the "U.S. Tactical Workforce," and no similar At-Will Statement is included for full-time, core employees. Based on this distinction, Tomlinson concedes that NCR can terminate tactical employees at-will, but argues that the limitation of the At-Will Statement to tactical employees evidences NCR's intent to terminate core employees only for cause. *Cf. Hamilton v. Parkdale Care Ctr., Inc.*, 904 P.2d 1110,

1112 (Utah Ct. App. 1995) ("[A] clear and conspicuous disclaimer in an employee handbook negates an employee's contention that the employment relationship is other than at will.").

¶35    In *Cabaness v. Thomas*, 2010 UT 23, 232 P.3d 486, the Utah Supreme Court considered an analogous issue. There, an employee brought a wrongful termination claim, alleging that an employee manual created an implied contract imposing an obligation on the employer to protect him from harassment by his supervisors. *Id.* ¶¶ 15, 47. In response, the employer relied on a disclaimer at the beginning of the manual which stated, "'No contract exists between [the employer] and its employees *with respect to* salary, salary ranges, movement within salary ranges, or employee benefits.'" *Id.* ¶ 58. The supreme court first concluded that the express language of the provision "does not contain broad and conspicuous language disclaiming any and all contractual liability," but is limited to "a few specifically identified items." *Id.* It then reasoned that by expressly restricting the contract disclaimer to those items, the employer "intended to create a contract with its employees with respect to the items in the [e]mployee [m]anual that are not specifically listed in the disclaimer." *Id.* Therefore, the *Cabaness* court held, as a matter of law, that the manual's imperative statements that harassment would not be tolerated created an implied contract that the employer would protect the employee from harassment. *Id.* ¶ 60 & n.9.

¶36    The supreme court's reasoning in *Cabaness* suggests that NCR's inclusion of the express At-Will Statement in Policy 422 that governs only the "U.S. Tactical Workforce" is evidence of its intent not to terminate other NCR employees without cause. Furthermore, although neither party has raised the immediately following section of the Manual, NCR's Corporate Management Policy Number 423 (Policy 423), we interpret the policies that have been highlighted in the context of the Manual as a whole. *See Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 335 (Utah 1992) ("An employee handbook may create binding terms only if those terms are consistent with the meaning of the contract as a whole."). Policy 423 relates specifically to part-time employees and states,

"Employment at NCR is AT WILL. No statement in this policy implies any guarantee of employment or length of employment." That policy further explains that "[p]art-time employees are considered to be a component of the core workforce." Thus, the Manual expressly designates tactical employees and part-time, core employees as terminable at-will, but it does not include an at-will statement directed at full-time, core employees. As discussed, Tomlinson has raised a factual issue of whether he was a full-time, core employee. *See supra* ¶ 32. In addition, NCR's limitation of its At-Will Statement to tactical employees and a subset of core employees raises a reasonable inference that NCR intended to terminate full-time, core employees only for cause. *Cf. Cabaness*, 2010 UT 23, ¶ 60.

C. Policy 210

¶37 Tomlinson further argues that NCR was required to follow progressive discipline procedures before it could terminate him, even for cause. In support, he argues that Policy 210, which is titled "Addressing Misconduct and Improving Performance," imposed a contractual obligation on NCR. To create an implied contract, the language of Policy 210 must evidence a "'manifestation of [NCR's] intent that is communicated to [Tomlinson] and sufficiently definite to operate as a contract provision.'" *See Cabaness*, 2010 UT 23, ¶ 55 (quoting *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1002 (Utah 1991)). If, however, Policy 210 is evidence only of "a practice, not a policy," then Tomlinson's claim fails as a matter of law because a "practice may be a sound one from an employer's perspective without becoming a mandate that such practices must be utilized in every instance."[12] *See Sorenson v. Kennecott–Utah Copper Corp.*, 873 P.2d 1141, 1149 (Utah Ct. App. 1994).

---

12. NCR's Corporate Management Policy Numbers 101 and 102 contain general provisions defining "policy development," "deviations from corporate management policies," and the distinction between policies and procedures.

¶38   Policy 210 addresses both employee misconduct and employee performance issues. For misconduct, Policy 210 includes a list of "Examples of Misconduct Suggesting an Initial Written Warning." At the end of that list, Policy 210 warns, "Repeated violations of any of the above examples or other more serious offenses will result in more extreme disciplinary action, up to and including termination of employment." Policy 210 then provides thirteen "Examples of Misconduct Suggesting Termination." The misconduct section of Policy 210 states, "Misconduct, depending on its seriousness, will generally be addressed by means of written warning . . . or other discipline up to and including termination." Thus, the misconduct provisions of Policy 210 indicate that NCR retains some discretion as to when and whether to provide a written warning before terminating an employee. *See Sanderson v. First Sec. Leasing Co.*, 844 P.2d 303, 306 (Utah 1992) (holding that the statement, in the employer's progressive discipline policy, that "[i]n situations where employee behavior warrants immediate termination the stages of this process do not need to be followed," granted the employer "unbounded discretion to discharge employees *without* following the guidelines").

¶39   With respect to performance issues, however, Tomlinson notes that Policy 210 uses command language. In particular, the first page of Policy 210 includes a "Policy Perspective" statement that indicates, "employees *will be advised* of expected levels of job performance and behaviors and *will receive notification* when results and behaviors fall below acceptable levels." (Emphases added.) *See Cabaness*, 2010 UT 23, ¶¶ 59–60 (holding, as a matter of law, that the statement, "'harassment . . . *shall not be tolerated*,'" combined with a disclaimer limited to other topics, constituted an implied contract). *But see Francisconi v. Union Pac. R.R. Co.*, 2001 UT App 350, ¶¶ 10–12, 36 P.3d 999 (holding, as a matter of law, that the existence of an expense reimbursement policy alone did not create an implied contract limiting the employer's right to terminate an employee at-will). It further provides, "Job performance issues such as <u>not</u> achieving objectives, and/or <u>not</u> demonstrating appropriate behaviors, *will result* in a Performance Improvement Plan (PIP) with stated requirements for improvement," and, "The

Performance Improvement Planning process *will be initiated* immediately whenever a 'Needs Improvement' rating is received during an annual review session, or anytime" that "performance falls short" in enumerated areas. (Third and fourth emphases added.) Policy 210 also directs managers to engage in certain conduct including assessing employee performance issues, preparing a performance improvement plan, ensuring that the employee understands the plan, obtaining a "document acknowledging receipt and understanding" signed by the employee, and following up with the employee. The manager is to "formally" close the plan if, after a reassessment, the employee's performance is "successful." If the employee fails to improve, however, "[t]he manager should issue the 'Final Warning Letter,'" which "*may result in termination* of the employment relationship *if* immediate performance improvements are not made." (Emphases added.) Tomlinson asserts that because the performance improvement portion of Policy 210 is mandatory, a reasonable jury could conclude from the definite terms in these provisions "that the parties agreed to limit the employer's right to terminate [him]." *See Johnson*, 818 P.2d at 1001.

¶40    NCR counters that Policy 210 does not create an implied-in-fact contract limiting its right to fire Tomlinson at-will because it is prefaced, in bold-faced print, with the following admonishment (the Disclaimer):

> These guidelines are not intended to be contractual in nature, nor should they be interpreted as strict rules for responses to individual activity. The appropriate response to each unique situation may differ. For example, some circumstances may call for immediate action, either in the way of written warning or termination, depending upon the frequency or the severity of the offense.

According to NCR, the Disclaimer was sufficient as a matter of law to inform Tomlinson that Policy 210 does not create an implied contract limiting NCR's right to terminate his employment at-will.

In response, Tomlinson argues that the Disclaimer can reasonably be interpreted as merely providing flexibility in determining whether to issue a written warning or to terminate the employee immediately due to the severity or frequency of the misconduct. In either instance, he claims that discipline, including termination, is permitted only for cause.

¶41    "[A] clear and conspicuous disclaimer in an employee handbook negates an employee's contention that the employment relationship is other than at will." *Hamilton v. Parkdale Care Ctr., Inc.*, 904 P.2d 1110, 1112 (Utah Ct. App. 1995); *see also Kirberg v. West One Bank*, 872 P.2d 39, 41 (Utah Ct. App. 1994) ("[W]here 'an employee handbook contains a clear and conspicuous disclaimer of contractual liability, any other agreement terms must be construed in light of the disclaimer.'" (quoting *Hodgson v. Bunzl Utah, Inc.*, 844 P.2d 331, 334 (Utah 1992))). Therefore, the issue before us is whether the trial court was correct in concluding, as a matter of law, that the Disclaimer clearly and conspicuously notified Tomlinson that he could not "reasonably believe that [NCR was] making an offer of employment other than employment at will." *See Johnson*, 818 P.2d at 1002; *see also Francisconi*, 2001 UT App 350, ¶ 10 ("If we conclude that a reasonable jury could not find an implied contract, we will affirm the summary judgment." (citation and internal quotation marks omitted)). "Factors relevant in determining whether a disclaimer is clear and conspicuous include (1) the prominence of the text; (2) the placement of the disclaimer in the handbook; and (3) the language of the disclaimer." *Hamilton*, 904 P.2d at 1112 (emphasis omitted).

¶42    In *Hamilton v. Parkdale Care Center, Inc.*, 904 P.2d 1110 (Utah Ct. App. 1995), this court applied those factors and concluded that the disclaimer at issue there was sufficient to defeat the plaintiff's wrongful termination claim as a matter of law. *Id.* at 1112–13. The *Hamilton* disclaimer stated, "'[N]or does the handbook constitute a contract of employment. . . . Employment is voluntary, which means at the will of both the employee and the Facility. . . . Either the employee or the Facility can terminate the employment relationship, at any time.'" *Id.* at 1112 (emphasis omitted). In

*Hamilton*, we first determined that the disclaimer was prominent because it was "clearly enumerated and set forth under the heading 'Handbook Information'" and because it was placed "on the first interior page of the handbook" in a manner "such that a reasonable employee ought to notice it." *Id.* Second, we determined that the disclaimer "specifically informed [the employee] that no contract of employment was being formed, that no binding contract terms were stated, and that either party could 'terminate the employment relationship . . . at any time.'" *Id.* at 1113.

¶43     Here, there is no general disclaimer or at-will statement at the introduction of the Manual. Instead, NCR's Corporate Management Policy Number 101 (Policy 101), the first policy in the Manual, ambiguously states, "Policies <u>may</u> provide for varying degrees of flexibility depending upon the specific linkage to company plans and objectives. If flexibility is not explicitly indicated in a policy, it is required that the policy be executed as defined." But the Disclaimer is prominently set forth in a separate text box, in bold font, at the beginning of Policy 210, which is the section of the Manual dealing with "Addressing Misconduct and Improving Performance." This placement is such that "a reasonable employee ought to notice it." *See id.* at 1112.

¶44     Unlike the *Hamilton* disclaimer, the Disclaimer in this case does not specifically state that employment at NCR is "at-will," nor does it define the voluntary nature of the employment relationship. *See id.*; *accord Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1003–04 (Utah 1991) (holding that a disclaimer setting forth policies for "general guidance only," which stated that it did "not create a binding contract" and that the employee could "be terminated without notice and at will at any time for any reason," unambiguously provided that employment was at-will). While both NCR and the trial court concluded that this case is controlled by *Hamilton*, we consider the lack of an at-will statement significant in the context of the facts before us. Indeed, NCR cites no Utah precedent in which a disclaimer lacking at-will language was held sufficient, as a matter of law, to defeat an employee's claim that a progressive discipline policy in an employee manual overcame the

at-will presumption.[13] While Utah appellate courts have affirmed summary judgments based on disclaimers of contractual rights, the decisions have consistently relied on language that also gives clear and conspicuous notice that employment remains at-will. *See, e.g., Giusti v. Sterling Wentworth Corp.*, 2009 UT 2, ¶ 47, 201 P.3d 966 ("'Employer *may terminate* Employee's employment with Employer *without cause at any time* upon two (2) weeks advance written notice to Employee.'" (emphases added)); *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 401 (Utah 1998) ("'This handbook is not intended to create a contract of employment . . . . *You are an "at-will" employee. . . .* [*The employer*] *has the right to terminate your employment at any time for any reason or no reason at all, without cause and without prior notice.*'" (emphasis added)); *Johnson*, 818 P.2d at 1003–04 ("'Your employment is for no set period and *may be terminated without notice and at will at any time* by you or the company.'"

---

13. Other jurisdictions have held that a clear and conspicuous contract disclaimer can prevent an employee manual from limiting an employer's right to terminate its employees, even in the absence of a corresponding at-will statement, when the language is clear and definitive. *See McCloud v. United Parcel Serv., Inc.*, 543 F. Supp. 2d 391, 403 (E.D. Pa. 2008), *aff'd*, 328 F. App'x 777 (3d Cir. 2009) (holding that a disclaimer stating, "'This particular code or policy handbook is not an expressed or implied contract of employment and does not create any contractual rights of any kind between [employer] and its employees,'" was clear enough that "[a] reasonable person in [p]laintiff's situation faced with such a specific disclaimer would not believe [the employer] intended to remove his at-will status"); *Anderson v. Douglas & Lomason Co.*, 540 N.W.2d 277, 288–89 (Iowa 1995) (holding that the statement, "This Employee Handbook is not intended to create any contractual rights in favor of you or the Company. The Company reserves the right to change the terms of this handbook at any time," was sufficient to disclaim any implied contract to engage in progressive discipline). However, neither of these decisions involved an employee manual that expressly identified only a subset of employees as terminable at-will.

(emphasis added)). Thus, the issue before us is whether the statement, "These guidelines are not intended to be contractual in nature," is sufficient, even without the accompanying reaffirmation of Tomlinson's at-will status, to preclude a reasonable jury from finding an implied-in-fact contract.

¶45    In the context of the facts of this case, we agree with Tomlinson that the disclaimer does not entitle NCR to judgment as a matter of law. The inclusion of at-will statements limited to tactical employees and part-time employees raised a reasonable inference that NCR intended to restrict its right to terminate full-time, core employees only for cause. Tomlinson has raised an issue of material fact concerning his status as a full-time, core employee. Furthermore, the Disclaimer could reasonably be interpreted as providing NCR the flexibility to forgo a written warning for severe or frequent misconduct, but affording no discretion with respect to employee performance plans. Even if NCR were free to deviate from both aspects of Policy 210, nothing in Policy 210 indicates that NCR could also discharge a full-time, core employee who has neither engaged in misconduct nor failed to meet performance expectations. Thus, the Disclaimer does not negate the inference created by the limited application of the express At-Will Statement that the termination of full-time, core employees must be for cause. Under these circumstances, a reasonable jury could find an implied contract limiting NCR's right to terminate Tomlinson at-will. Accordingly, the trial court erred in entering summary judgment against Tomlinson on his wrongful termination claim.

D. The Good Faith Covenant

¶46    We also conclude that summary judgment is inappropriate on the issue of the Good Faith Covenant. Because the Good Faith Covenant is inherent in any contract, if the Manual established an implied contract, it would be subject to the Good Faith Covenant. *See Cabaness v. Thomas*, 2010 UT 23, ¶ 61, 232 P.3d 486; *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991). Thus, the trial court also erred in dismissing this claim.

CONCLUSION

¶47     We affirm the trial court's dismissal of seven of Tomlinson's claims against NCR under rule 12(b)(6) of the Utah Rules of Civil Procedure. However, the trial court erred in granting summary judgment to NCR on Tomlinson's claims that the Manual created an implied contract and that NCR violated the Good Faith Covenant.

¶48     Affirmed, in part; reversed and remanded, in part.

————————